**Romeo K. ABOO, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 08–546C.

United States Court of Federal Claims.

March 31, 2009.

Romeo K. Aboo, pro se, Miami, FL.

Scott A. MacGriff, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Michael F. Hertz, Acting Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of Counsel was Sophia Marta Ivashkiv, Assistant General Counsel, Federal Bureau of Investigation, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Romeo K. Aboo was a cooperating witness in an investigation of Khaldon Esawi, Khaled Obeid, and Taher Yousef for money laundering and drug trafficking. Compl. ¶¶ 4–6. These three men along with twelve other individuals were convicted in federal court of numerous offenses, including money laundering and conspiracy to possess controlled substances. Def.'s Proposed Findings of Uncontroverted Fact at 1 ("Def.'s Facts"). Mr. Aboo asserts that, prior to agreeing to work with the government as a cooperating wit-

ness, he and representatives of the federal government entered into a contract that required the government to keep his identity secret and pay him an award, which included reimbursing him for any expenses he incurred while cooperating with the government. Compl. ¶ 3. Mr. Aboo claims that the government breached the contract by failing to provide for his safety and security, not paying him the full amount of the award that he was owed, and not reimbursing him for the expenses he incurred while acting as a cooperating witness. Compl. ¶¶ 63–65, 67, 68, 73. The government has moved to dismiss Mr. Aboo's complaint, or, in the alternative, for summary judgment, asserting that he did not have a contract with the government and that, contemporaneously with receiving an award from the government of $200,000, he released the government from all liability relating to his work as a cooperating witness in the investigation of Khaldon Esawi, Khaled Obeid, and their associates. Def.'s Mot. and Br. to Dismiss Pl.'s Compl., or in the Alternative, for Summary Judgment at 10 ("Def.'s Mot.").

### BACKGROUND[1]

Since 2000, Mr. Aboo has provided federal law enforcement officials with confidential information about suspected criminal activities. Def.'s Facts at 1; Def.'s Motion, Ex. 1 (Decl. of Brent E. Potter, Special Agent of the Federal Bureau of Investigation (Dec. 15, 2008) ("Potter Decl.")) at 1. In November 2000, Special Agent Potter registered Mr. Aboo as a cooperating witness with the Federal Bureau of Investigation ("FBI"). *Id.* Mr. Aboo's initial involvement with the FBI was in a matter that was unrelated to the criminal investigation of Khaldon Esawi. *Id.* In conjunction with his registration as a cooperating witness, Mr. Aboo was provided with admonishments from the FBI on December 4, 2000. *Id.* The admonishments

specified that "the [f]ederal [l]aw [e]nforcement [a]gency cannot guarantee any rewards, payments, or other compensation to the Cooperating Individual/Confidential Informant." Def.'s Mot., Ex. 3 (Required Admonishments to Confidential Informants and Cooperating Witnesses (Dec. 4, 2000)) at 22.[2] The admonishments further advised Mr. Aboo that "the United States Government will[ ] strive to protect a [c]onfidential [i]nformant's identity (and C[ooperating] W[itness]'s identity except as necessary for trial and/or related investigative purposes) but cannot guarantee that it will not be divulged." *Id.*[3]

In March 2001, Mr. Aboo provided Special Agent Potter with confidential information about criminal activities of Khaldon Esawi, Taher Yousef, and numerous other individuals. Potter Decl. at 2. Among other things, Mr. Aboo informed Special Agent Potter that Shuman Trading Company, Mr. Aboo's employer, "was a shell company … and used for illegal purposes." Def.'s Mot. at 4 (citing Potter Decl. at 2). Following this conversation, Special Agent Potter contacted the Internal Revenue Service ("IRS") to inform them that Khaldon Esawi and his associates were suspected of engaging in money laundering and tax fraud. Potter Decl. at 2. Special Agent Potter also contacted the Drug Enforcement Administration ("DEA") and was informed of an ongoing investigation called Operation Mountain Express II, which "targeted large scale trafficking organizations illegally smuggling pseudoephedrine from Canada to Chicago and the[n] to California where it was sold to Mexican methamphetamine manufacture[r]s." *Id.*

Between April and July 2001, Mr. Aboo had several meetings with Special Agent Potter, who was frequently accompanied by Special Agent Robert Schumaker. Potter Decl. at 3. In July 2001, Special Agent Schumaker

---

1. The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are either undisputed or uncontested, except where a disagreement is noted.

2. Defendant's exhibits are paginated sequentially and consecutively rather than separately, and citations to those exhibits will follow defendant's pagination.

3. Mr. Aboo maintains that the documentary evidence of admonishments submitted by the government is fabricated. Pl.'s Resp. to Def.'s Mot. to Dismiss or in the Alternative for Summary Judgment ("Pl.'s Resp.") at 4.

assumed responsibility "for handling Mr. Aboo." *Id.* At this time, Mr. Aboo left his job at the Shuman Trading Company and became the business manager for Khaldon Esawi. Def.'s Mot., Ex. 6 (Decl. of Maria Suarez, Special Agent, IRS Criminal Investigation Division (Dec. 22, 2008) ("Suarez Decl.")) at 32.[4] While he was working for Khaldon Esawi, Mr. Aboo maintained frequent contract with Special Agent Schumaker. Def.'s Facts at 4. In August 2001, Special Agent Schumaker introduced Mr. Aboo to Special Agent Maria Suarez of the IRS. Suarez Decl. at 30.

Following the terrorist attacks of September 11, 2001, the FBI determined that its investigation of Khaldon Esawi and his associates would be more appropriately handled by the Operation Mountain Express II task force. *See, e.g.,* Def.'s Facts at 4; Def.'s Mot., Ex. 5 (Decl. of Robert Schumaker, Special Agent, FBI (Dec. 18, 2008) ("Schumaker Decl.")) at 27. Because the FBI decided to end its involvement in investigating Khaldon Esawi, "responsibility for handling Mr. Aboo [was transferred] to IRS S[pecial] A[gent] [Maria] Suarez." Def.'s Facts at 4; Schumaker Decl. at 27. On September 23, 2001, Mr. Aboo was registered as a cooperating witness with the IRS. Suarez Decl. at 30. When he was registered as a cooperating witness with the IRS, Mr. Aboo was provided with a list of admonishments that informed him that "the IRS cannot guarantee any rewards, payments, or other compensation to him/her" and that the federal "government will strive to protect a confidential informant's identity, but cannot guarantee that it will not be divulged." Def.'s Mot., Ex. 7 (Approved Confidential Informant Advice (Sept. 23, 2001)) at 37. On October 5, 2001, in response to these developments, the FBI closed Mr. Aboo's file as a cooperating witness and stopped "any active use of Mr. Aboo as a [cooperating witness]." Def.'s Facts at 4.

Thereafter, Mr. Aboo provided documents and information about the criminal activities of Khaldon Esawi and his compatriots to the IRS. Suarez Decl. at 31. In January 2002, Khaldon Esawi and fourteen other individuals were arrested and charged with committing numerous crimes. *See id.* The fifteen individuals pleaded guilty and were convicted of crimes that included money laundering and conspiracy to possess controlled substances. *Id.* During the pendency of the criminal case, filings made by the government with the pertinent district court contained information that "could have been used ... to identify Mr. Aboo as a cooperating witness." Def.'s Mot. at 7. In light of this development, the government determined that it was necessary to take affirmative steps to protect Mr. Aboo from any retribution and moved him to a safe house. *Id.* Mr. Aboo resided at the safe house from January 2002 to approximately June 15, 2002. Suarez Decl. at 32.

At some point during his stay at the safe house, Mr. Aboo informed Special Agent Suarez that he desired to relocate so he could resume working. Suarez Decl. at 32. Mr. Aboo indicated that he wished to move to South Carolina. *Id.* at 33. However, Mr. Aboo failed to provide Special Agent Suarez with an estimated cost of his moving expenses such that those expenses could be submitted to her superiors for approval. *Id.* Additionally, the IRS offered Mr. Aboo the opportunity to enter the "Witness Protection Program;" however, he declined to do so. *Id.*[5] Mr. Aboo was required to leave the safe house on June 15, 2002 because he had exceeded the amount of time that the IRS allowed a person to spend in a "safe house while looking for a place to live." *Id.* The last face-to-face meeting between Mr. Aboo and Special Agent Suarez occurred on June 18, 2002. *Id.* On April 6, 2003, Special Agent Suarez closed Mr. Aboo's file as a cooperating witness with the IRS. *Id.*

---

**4.** The parties dispute whether Mr. Aboo entered into the employment of Khaldon Esawi at the behest of the FBI or of his own volition. *Compare* Pl.'s Resp. at 4, *with* Def.'s Mot. at 4.

**5.** Mr. Aboo asserts that the government never offered him the opportunity to participate in the witness protection program. Pl.'s Resp., Ex. 3

(Pl.'s Answer to the Decl. of Maria Suarez) at 9. Mr. Aboo also claims that Special Agent Suarez's declaration contains concocted stories which were designed solely to discredit his allegations and thus the information in her declaration should be disregarded. *Id.* at 7.

Following his last meeting with Special Agent Suarez in June 2002, Mr. Aboo repeatedly contacted Special Agents Suarez and Schumaker requesting that he receive an award for the confidential information he had provided about Khaldon Esawi and his codefendants. Suarez Decl. at 34. On at least two occasions, Mr. Aboo filed an application with the IRS to receive an award for his assistance. *Id.* However, Mr. Aboo was not entitled to receive an award from the IRS "because there were no IRS tax charges established in the Esawi case." *Id.* Special Agent Suarez informed Mr. Aboo that he should contact DEA to inquire about any potential award. *Id.*

In January 2008, Mr. Aboo's request to receive an award was brought to the attention of Kevin Powers, who was serving as Division Counsel in DEA's Chicago Division Office. Def.'s Mot., Ex. 10 (Decl. of Kevin Powers (Dec. 22, 2008) ("Powers Decl.")) at 51.[6] Mr. Powers agreed to help Mr. Aboo seek a discretionary award under 28 U.S.C. § 524(c)(1)(B). *Id.* As a prerequisite to receiving an award, Mr. Powers had to register Mr. Aboo as a confidential source with DEA. *Id.; see* Def.'s Mot., Ex. 11 (DEA Confidential Source Agreement (Feb. 7, 2008)) at 54–55. After reviewing the contributions made by Mr. Aboo to the investigation and prosecution of Khaldon Esawi and his codefendants, Mr. Powers received authorization to make a one time award of $200,000 to Mr. Aboo. Powers Decl. at 51–52. For Mr. Aboo to receive this award, the government required him to sign a "Release/Hold Harmless Agreement." *Id.* at 52. The agreement stated that:

> [t]his payment of $200,000 is made subject to your agreement to unconditionally release and hold harmless the United States, its agencies and employees, including but not limited to the Drug Enforcement Administration, from any claims, demands, causes of action or lawsuits, of whatever kind or description, wherever situated, that might now exist or hereafter exist by reason of or grow out of, directly or indirectly, the assistance provided by you during a

large scale law enforcement investigation that targeted a large scale trafficking organization that illegally smuggled pseudoephedrine from Canada to Chicago and then to California where it was sold to Mexican methamphetamine manufacturers.

Def.'s Mot., Ex. 12 (Release/Hold Harmless Agreement (June 26, 2008)) at 56.

On June 26, 2008, Mr. Aboo went to the Miami office of the DEA to collect his award. Powers Decl. at 52. Upon being informed that he would receive $200,000 as his award and be required to execute a "Release/Hold Harmless Agreement" to collect it, Mr. Aboo called Mr. Powers to complain about the size of his award and having to sign the "Release/Hold Harmless Agreement." *Id.* Mr. Powers informed Mr. Aboo that he would only receive $200,000 if he signed the "Release/Hold Harmless Agreement" and that he had the option of declining to accept the award. *Id.* After his discussion with Mr. Powers, Mr. Aboo signed the "Release/Hold Harmless Agreement" and was given a check for $200,000. *See, e.g., id.* at 52; Def.'s Mot., Ex. 12 (Release/Hold Harmless Agreement) at 56.

Mr. Aboo filed his complaint in this court on July 29, 2008, and on January 5, 2009, the government filed its motion to dismiss or in the alternative for summary judgment. The government's motion has been fully briefed and accordingly is ready for disposition.

## STANDARDS FOR DECISION

Rule 12(d) of the Rules of the Court of Federal Claims ("RCFC") provides that "[i]f, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56." In converting a motion to dismiss under RCFC 12(b)(6) to one for summary judgment, the court must afford the "parties ... a reasonable opportunity to present all the material that is pertinent to the motion." RCFC 12(d). Here, both parties have submitted extensive mate-

---

**6.** Mr. Powers had previously served as an Assistant United States Attorney and in that capacity he was responsible for prosecuting Khaldon Esawi and his codefendants. Powers Decl. at 50–51.

rials outside the pleadings in addressing the government's pending motion. *See* Def.'s Mot.; Pl.'s Resp. Accordingly, the court will treat the government's motion as a motion for summary judgment under RCFC 56(c).

Summary judgment is proper when the evidence demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" dispute exists if the issue "may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. A material fact is one which "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. Mere denials, conclusory statements, or evidence that is not significantly probative will not suffice to preclude summary judgment. *Id.* at 249–52, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987). In considering the existence of a genuine issue of material fact, a court must draw all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary may be granted. *Id.*

## ANALYSIS

### I. AWARD UNDER A MONEY–AUTHORIZING STATUTE, NOT A MONEY–MANDATING ONE

The Tucker Act gives this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Rather, it provides the waiver of sovereign immunity that is necessary to sue the United States. Thus, in invoking the Tucker Act, the plaintiff must identify a substantive source of law that "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Mitchell,* 463 U.S. 206, 217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (quoting *Testan,* 424 U.S. at 400, 96 S.Ct. 948 (in turn quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967))).

Mr. Aboo was paid his $200,000 award under the asset forfeiture statute, 28 U.S.C. § 524. *See* Powers Decl. at 51. The statute provides for

(c)(1) . . . a special fund to be known as the Department of Justice Assets Forfeiture Fund . . . which shall be available to the Attorney General without fiscal year limitation for the following law enforcement purposes—

. . .

(B) the payment of awards for information or assistance directly relating to violations of the criminal drug laws of the United States or of sections 1956 and 1957 of title 18, sections 5313 and 5324 of title 31, and section 6050I of the Internal Revenue Code of 1986;

(C) at the discretion of the Attorney General, the payment of awards for information or assistance leading to a civil or criminal forfeiture involving any Federal agency participating in the Fund;

. . .

(c)(2) Any award paid from the Fund, as provided in paragraph (1)(B) or (C), shall be paid at the discretion of the Attorney General or his delegate, under existing departmental delegation policies for the payment of awards, except that the authority to pay an award of $250,000 or more shall not be delegated to any person other

than the Deputy Attorney General, the Associate Attorney General, the Director of the Federal Bureau of Investigation, or the Administrator of the Drug Enforcement Administration.

28 U.S.C. § 524(c)(1)(B)-(C), (c)(2).

 In interpreting the asset forfeiture statute, the Federal Circuit has explained that neither the statute nor any of its provisions are "money-mandating." *Perri v. United States*, 340 F.3d 1337, 1341 (Fed.Cir. 2003) ("It is a money-authorizing statute, not a money-mandating one."). Indeed, the asset forfeiture statute explicitly provides that an award of compensation under the provisions at issue in this case is left to "the discretion of the Attorney General or his delegate." 28 U.S.C. § 524(c)(2); *see SGS–92–X003 v. United States*, 85 Fed.Cl. 678, 704 (2009) (stating that "the asset forfeiture statute explicitly grants the discretion to pay awards to the Attorney General or his delegee"). Because the asset forfeiture statute gives the Attorney General or his delegate the discretion to determine whether to make a compensatory award, the statute cannot appropriately be interpreted as being money-mandating. *Perri*, 340 F.3d at 1342 (concluding that given the language of the asset forfeiture statute, "it would be difficult, if not impossible, to argue" the relevant provisions are "money-mandating").[7] The Federal Circuit additionally determined that a cooperating witness cannot rely on the asset forfeiture statute as the basis for a claim against the government because "[i]t provides no standards for determining 'payment of awards' [or] ... the amount to be paid." *Perri*, 340 F.3d at 1342 (quoting 28 U.S.C. § 524(c)(1)(B)). Thus, the asset forfeiture statute fails to create a substantive right to recovery against the United States.

However, Mr. Aboo does not rely on the asset forfeiture statute to support his claims against the United States. Instead, Mr. Aboo claims that he entered into a contract with the FBI prior to agreeing to be a cooperating witness in the investigation of Khal-

don Esawi. Compl. ¶ 3. Mr. Aboo claims that the contract provided that the government would keep his identity "a secret at all times," that he would receive a monetary award, and that the government would reimburse him for the expenses he incurred while assisting in the investigation of Khaldon Esawi. *Id.* Mr. Aboo asserts that when he became a cooperating witness for the IRS, the agency was informed of his contract with the FBI and agreed to be bound by the same terms. *See* Compl. ¶ 10.

## II. ALLEGED CONTRACT

 The Tucker Act provides this court with jurisdiction over claims based "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). However, the Supreme Court has determined that the Tucker Act does not provide a basis for claims against the United States "based on contracts implied in law." *Mitchell*, 463 U.S. at 218, 103 S.Ct. 2961 (citing *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925)). Consequently, to be enforceable in this court, contracts must either be in writing or be implied-in-fact. In either case, to have a valid contract with the federal government, a claiming plaintiff must demonstrate " 'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.' " *California Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001) (quoting *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999)); *see also American Fed. Bank v. United States*, 62 Fed.Cl. 185, 194 (2004). For Mr. Aboo to recover on a breach of contract claim he "must demonstrate ... the existence of a valid contract, a duty arising out of the contract, a breach of that duty, and damages caused by the breach." *Cooley v. United States*, 76 Fed.Cl. 549, 555–56 (2007) (citing *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir.1989)). In this instance,

---

7. The decision in *Perri* parallels that rendered in *Krug v. United States*, 168 F.3d 1307 (Fed.Cir. 1999), which addressed 26 U.S.C. § 7623 and its implementing regulations—provisions of law that pertain to when a cooperating witness can re-

ceive an award for reporting a violation of the internal revenue laws. In *Krug*, the court of appeals concluded that Section 7623 and implementing regulations "alone do not contractually bind the government." 168 F.3d at 1308.

the government asserts that summary judgment is appropriate "[b]ecause the Special Agents alleged to have made the contract with Mr. Aboo lack[ed] contracting authority." Def.'s Mot. at 13.

### A. Written Contract

The asset forfeiture statute permits the United States to enter into contracts with cooperating witnesses. *See* 28 U.S.C. § 524(c)(1). Here, Mr. Aboo claims he initially entered into a contract with the FBI and that contract was later assumed by the IRS, Compl. ¶ 10, but he does not allege that the contract he purportedly entered into with the government was memorialized in writing. *See, e.g.,* Compl. ¶¶ 3, 10; Def.'s Mot. at 12.

### B. Implied–in–Fact Contract

 "[A]n implied-in-fact contract is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *La Van v. United States,* 382 F.3d 1340, 1346 (Fed.Cir.2004) (internal quotation omitted). Any such tacit understanding may be undermined by a lack of authority on the part of the governmental actor to bind the government. For a valid contract to exist with the United States, the government's representative must have either express or implied actual authority to enter into the contract. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). In the circumstances of this case, both avenues are difficult to establish. As will be discussed, express authority was and is limited by law, and implied authority is restricted to situations where "such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *Id.* at 324. The Supreme Court has explained that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

### 1. Express actual authority to contract.

 A representative of the United States only has express actual authority necessary to enter into a valid contract "when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." *SGS–92–X003 v. United States,* 74 Fed.Cl. 637, 651 (2007) (citing *Tracy v. United States,* 55 Fed.Cl. 679, 682 (2003)). The asset forfeiture statute does not give Special Agents the express authority to enter into contracts, and, indeed, it was designed to curtail the contracting authority of special agents. *See Salles v. United States,* 156 F.3d 1383, 1384 (Fed.Cir.1998). "To the extent rewarding informants was an integral part of the duties of the [Special Agents], they were limited by the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98–473, codified at 28 U.S.C. § 524(c)." *Id.* In addition, internal regulations of agencies within the Department of Justice may limit those who contract on its behalf. *See SGS–92–X003,* 85 Fed.Cl. at 704, 2009 WL 331473, at *26 ("[A] confidential informant ... would only be paid commissions above the $25,000 quarterly limitation after high level officials approved the payment."); *Tracy,* 55 Fed.Cl. at 683 (citing 48 C.F.R. §§ 1.601, 1.602.1 for the proposition that for "DEA agents to have contracting authority on behalf of the DEA, such authority must be specifically delegated to them in writing"); *Doe v. United States,* 48 Fed.Cl. 495, 503 (2000) (finding that DEA agents lacked the authority to bind the agency given that the "DEA's internal procedures expressly preclude DEA agents from exercising contractual authority"); *see also* Def.'s Mot. at 22 ("Without a 'Cooperative Witness Agreement' between plaintiff and an authorized official from the FBI's contracting office, there can be no authorized agreement between the FBI and a purported cooperating witness.").

 Mr. Aboo alleges that he was entitled to receive an award of $750,000 for his work as a cooperating witness. The asset forfeiture statute states that the approval to pay an award of $250,000 or more cannot "be delegated to any person other than the Deputy Attorney General, the Associate Attorney General, the Director of the Federal Bureau

of Investigation, or the Administrator of the Drug Enforcement Administration." 28 U.S.C. § 524(c)(2). Thus, the asset forfeiture statute does not grant Special Agents of the FBI or IRS the authority to approve an award of the size that Mr. Aboo sought to receive in exchange for his assistance.

Similarly, the governing FBI regulations explicitly withhold authority from Special Agents to approve lump-sum reward payments. The relationship between the FBI and cooperating witnesses is governed by the FBI's Manual of Administrative Operations and Procedures and the Manual of Investigative Operations and Guidelines. The latter Manual provides that awards to cooperating witnesses "are subject to the S[pecial] A[gent] [in] C[harge]'s payment authority." Def.'s Mot., Ex. 2 (Cooperative Witness Program Interim Guidelines (Apr. 10, 1990)) at 15. The Manual of Administrative Operations and Procedures provides that a Special Agent in Charge "may authorize up to $100,000 per fiscal year for confidential expenditures incurred in connection with any single investigative matter." Def.'s Mot., Ex. 17 (Manual of Administrative Operations and Procedures Part 2) at 75. When a Special Agent in Charge wishes to exceed the $100,000 limitation, he or she must request authorization "from the C[riminal] I[nformant]/W[itness] S[ecurity] P[rograms] U[nit], FBIHQ.... Lump-sum payments will also be requested through the CI/WSPU." Def.'s Mot., Ex. 2 (Cooperative Witness Program Interim Guidelines) at 16. Additionally, the FBI Manual of Administrative Operations and Procedures provides that "contracts obligating funds of the FBI ... must be executed by a contracting officer at FBIHQ or at your field office depending upon the dollar value of the contract." Def.'s Mot., Ex. 17 (Manual of Administrative Operations and Procedures Part 2) at 76.

In sum, the size and form of the payment that Mr. Aboo claims he is entitled to receive required approval from FBI headquarters before FBI Special Agents could have agreed to accept his terms. Thus, the Special Agents with whom Mr. Aboo had contact did not themselves have the authority under FBI procedures to approve an award of the size and type that he claims he is entitled to receive. Furthermore, the FBI was unable to locate any documentation indicating that it sought approval from its headquarters for a lump-sum payment to Mr. Aboo. Def.'s Mot., Ex. 22 (Decl. of Michael F. Pavia, Chief Division Counsel of the FBI Chicago Field Office (Dec. 18, 2008) ("Pavia Decl.")) at 95. In responding to the government's motion, Mr. Aboo has failed to come forward with any factual support to rebut the government's evidence and create a genuine issue of material fact as to whether the FBI or IRS Special Agents that handled his case had express actual authority to authorize an award of $750,000.

2. *Implied actual authority to contract.*

Courts have found implied actual authority to exist "when the employee cannot perform his [or her] assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees." *SGS–92–X003,* 74 Fed. Cl. at 652 (citations omitted). Following this line of reasoning, one hypothetical ground for Mr. Aboo's claim that the Special Agents had implied actual authority to enter into a binding contract is that the FBI and IRS need cooperating witnesses to assist in criminal investigations and thus it is necessary for Special Agents from these agencies to enter into contracts to secure the assistance of cooperating witnesses.

 Such argument, however, is not persuasive. The agencies provide other individuals with the authority to pay awards to cooperating witnesses. *See, e.g.,* Def.'s Mot., Ex. 2 (Cooperative Witness Program Interim Guidelines) at 16; 26 C.F.R. § 301.7623–1(c) (addressing rewards for information relating to violations of internal revenue laws). Thus, to the extent that paying an award to a cooperating witnesses is essential to the law enforcement functions of the FBI and IRS, the payment procedures outlined in their governing regulations address that purpose. *See Roy v. United States,* 38 Fed.Cl. 184, 190 (1997) (finding that FBI Special Agents "can achieve their goal of inducing informant cooperation by following estab-

lished Manual payment procedures"); *Cruz–Pagan v. United States,* 35 Fed.Cl. 59, 61–62 (1996) (concluding that "because reasonably efficient alternatives appear to exist to create the desired expectation of compensation, it would not be necessary or essential for DEA to grant contracting authority to its field agents"). Thus, the asset forfeiture statute and the existence of detailed FBI and IRS guidelines authorizing senior agency officials to compensate cooperating witnesses demonstrate that Special Agents do not have implied actual authority. Moreover, Mr. Aboo had some notice of the limitations on promises of awards because the admonishments given Mr. Aboo by Special Agent Potter of the FBI specifically negated any guarantee of "rewards, payments, or other compensation." Def.'s Mot., Ex. 3 (Required Admonishments to Confidential Informants and Cooperating Witnesses) at 22.

 Lastly, the government can be bound by contract even if its representatives lacked the necessary actual authority, if the contract was ratified by an official with the necessary authority. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1433 (Fed.Cir.1998). To ratify a contract entered into by a government official without actual authority, the superior official "must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." *California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 27–28 (1990). Valid ratification requires not only that there be "some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing." *Henke v. United States,* 43 Fed.Cl. 15, 27 (1999).

Mr. Aboo's claim of ratification or adoption of an alleged implied-in-fact contract by the IRS is fraught with legal difficulty. The Secretary of the Treasury possesses the ability to pay monetary awards to cooperating witness for information that relates to the underpayment of taxes or violations of the internal revenue laws. 26 U.S.C. § 7623(a). The Treasury Secretary has delegated his authority to pay compensatory awards to co-operating witnesses to district or service center directors. 26 C.F.R. § 301.7623–1(a). The applicable Treasury Regulations further provide that "[n]o person is authorized under this section to make any offer, or promise, or otherwise to bind a district or service center director with respect to the payment of any reward or the amount of the reward." 26 C.F.R. § 301.7623–1(c). Additionally, the IRS Handbook of Delegation Orders, which was in effect at the time Mr. Aboo was serving as a cooperating witness, provided that "[t]he authority vested in the Commissioner of Internal Revenue and District Directors ... to approve rewards for information relating to violations of internal revenue laws is hereby delegated to Service Center Directors, the Directors, Austin Compliance Center and the Assistant Commissioner (International)." Def.'s Mot., Ex. 18 (IRS Handbook of Delegation Orders (Oct. 4, 1990)) at 79. The IRS Handbook of Delegation Orders explicitly prevents the authority to approve awards from being "redelegated" to positions "lower than Chief, Examination Branch or Chief, Examination Division." *Id.* Thus, under the applicable Treasury Regulations and internal operating regulations of the IRS, Special Agent Suarez was explicitly prohibited from ratifying, adopting, or entering into an agreement that promised Mr. Aboo an award for any information that he would provide. Additionally, there is no evidence to demonstrate that the supervisors of the Special Agents from the FBI and IRS that handled Mr. Aboo's case knew that there was an unauthorized contract, let alone acquiesced in such a contract. *See* Pavia Decl. at 94–95. Mr. Aboo has not pointed to any evidence that raises a question of material fact concerning whether ratification occurred.

In sum, Mr. Aboo has failed to come forward with plausible evidence that raises an issue of material fact concerning whether he had a valid implied-in-fact contract with the United States. Mr. Aboo has not controverted the government's showing that the FBI and IRS Special Agents who handled his case did not have the actual authority necessary to bind the United States, nor has he provided a factual basis for his claim that any alleged unauthorized contract with the FBI

and IRS Special Agents was ratified by a superior official. The only contract that Mr. Aboo ostensibly entered into with the government during his service as a cooperating witness and subsequent effort to collect an award is the release he signed in exchange for the receipt of $200,000.

## III. WITNESS PROTECTION

Mr. Aboo claims that he is entitled to monetary damages for the government's alleged failure to "provid[e] for his safety and security." Compl., Prayer for Relief ¶ 3. Mr. Aboo's claim stems from a filing in the district court that contained information which could have been used to identify him as a cooperating witness. Suarez Decl. at 31. Mr. Aboo asserts that the Special Agents working on behalf of the FBI and IRS guaranteed him that his identity as a cooperating witness in the Khaldon Esawi investigation would never be disclosed. Compl. ¶ 3. According to Mr. Aboo, the government breached that agreement when its filing contained information which could be used to identify him as a cooperating witness. Compl. ¶¶ 18–19.

Chapter 18 of the United States Code gives the Attorney General of the United States the authority to provide "for the ... protection of a witness or a potential witness for the [f]ederal [g]overnment." 18 U.S.C. § 3521(a)(1); *see United States v. Partin,* 493 F.2d 750, 758 (5th Cir.1974) (describing the statutory forerunner to 18 U.S.C. § 3521 as "provid[ing] the Attorney General with the authority to protect and maintain any witness whose life and limb may be in jeopardy because of his testimony").[8] The statutory provisions give the Attorney General wide discretion in determining what measures are necessary to secure the safety of individuals that are cooperating with the United States. *See* 18 U.S.C. § 3521(b)(1) (stating that "the Attorney General shall take such action as the Attorney General determines to be necessary to protect the person involved from bodily injury and otherwise to assure the health, safety, and welfare of that person"). A further statutory provision states that "the

Attorney General may enter into such contracts or other agreements as may be necessary" to provide for the protection of a witness. 18 U.S.C. § 3527. In the instant case, the government exercised the authority given to it by these statutory provisions when it placed Mr. Aboo in a safe house. *See* Suarez Decl. at 32.

■ After information that potentially could be used to identify Mr. Aboo was revealed in a filing in the prosecution of Khaldon Esawi, the IRS, fearing for Mr. Aboo's safety, placed him in a safe house. Suarez Decl. at 31–32. Mr. Aboo lived in the safe house for approximately six months. *See id.* at 32. During his time at the safe house, Mr. Aboo expressed his desire to move to South Carolina and the IRS offered to pay Mr. Aboo's moving expenses. *Id.* at 33. However, Mr. Aboo failed to accept this arrangement because he never submitted a required estimate of his moving expenses. *Id.* Additionally, the IRS offered Mr. Aboo the opportunity "to be relocated under [the] Witness Protection Program." *Id.* Mr. Aboo, once again, failed to accept the government's offer of permanent assistance. *Id.* Thus, Mr. Aboo's contention that "the government ab[a]ndoned [him]," Pl.'s Resp. at 5, is simply not supported by facts. In effect, Mr. Aboo, and not the government, was responsible for the termination of his government-provided protection.

The documentary materials supplied by the parties in addressing the pending motion tend to negate any implication that Mr. Aboo had a contract with the government that guaranteed his identity—or information that could be used to identify him—would absolutely be kept secret. The admonishments provided to Mr. Aboo by the FBI expressly stated that "the United States Government will[ ] strive to protect a Confidential Informant's identity (and C[ooperating] W[itness]'s identity except as necessary for trial and/or related investigative purposes) but cannot guarantee that it will not be divulged." Def.'s Mot., Ex. 3 (Required Admonishments to Confidential Informants and Cooperating Witnesses) at 22. Additionally,

---

**8.** The Attorney General has delegated his responsibilities under 18 U.S.C. § 3521 to the Director of the United States Marshals Service. 28 C.F.R. § 0.111(c).

the FBI regulations in effect when Mr. Aboo was a cooperating witness provided that "[a]ll disclosure authority relative to C[ooperating] W[itnesse]s is at the discretion of the [Special Agent in Charge]." *Id.*, Ex. 2 at 19 (Cooperating Witness Program–Interim Guidelines). The admonishments received by Mr. Aboo from the IRS similarly advised that the government could not guarantee that his identity "will not be divulged." *Id.*, Ex. 7 (IRS Approved Confidential Informant Advice) at 37.

Consequently, Mr. Aboo's claim for damages stemming from the disclosure of information relating to his identity in a filing with the district court in the prosecution of Khaldon Esawi is unavailing. Mr. Aboo has failed to come forward with evidence that indicates that he had an agreement with the United States to maintain the confidentiality of his identity. And, he has not responded to the government's motion with materials that contravene the documentary submissions by the government indicating that its agents continually advised Mr. Aboo that there was a risk that his identity would be divulged. Thus, Mr. Aboo has failed to raise an issue of material fact to preclude the entry of summary judgment for the government on this issue.[9]

## IV. EXPENSES

Mr. Aboo alleges that the government promised him that he would be reimbursed for all the expenses he incurred while serving as a cooperating witness in the investigation of Khaldon Esawi and his associates. Compl. ¶ 3. Mr. Aboo claims that the government has breached this alleged contract because it has not reimbursed him for his expenditures. *See* Compl., Prayer for Relief ¶ 2. Mr. Aboo alleges that he incurred $100,000 worth of expenses while serving as a cooperating witness in the investigation of Khaldon Esawi and now seeks to recover that amount. *Id.*

Mr. Aboo's contention that he is entitled to be reimbursed for his expenses is unavailing. Mr. Aboo asserts that the government's promise to reimburse him for his expenses was a term of the alleged contract that he entered into with the Special Agents of the FBI and IRS. Compl. ¶¶ 3, 10. As with Mr. Aboo's claim regarding his entitlement to awards, he is unable to establish that the Special Agents who handled his case had the authority to enter into a contract obligating the funds of the United States. Simply put, the Special Agents with whom Mr. Aboo dealt lacked express or implied actual authority to commit the financial resources of the FBI or IRS to a cooperating witness. *See supra*, at 9–12.

## V. RELEASE

In June 2008, in exchange for receiving a $200,000 award for his services as a cooperating witness in the investigation and prosecution of Khaldon Esawi and his associates, the government required Mr. Aboo to sign a release. Powers Decl. at 52. After hesitation, Mr. Aboo signed the release. *Id.* The release was comprehensive, providing that Mr. Aboo "agree[d] to unconditionally release and hold harmless the United States … from any claims, demands, causes of action or lawsuits, of whatever kind or description, wherever situated, that might now exist or hereafter exist by reason of or grow out of, directly or indirectly, the assistance provided by you during a[n] … investigation that targeted a[n] … organization that illegally smuggled pseudoephedrine." Def.'s Mot., Ex. 12 (Release/Hold Harmless Agreement) at 56. As an alternative ground for a summary judgment in its favor, the government asserts that Mr. Aboo's claims for monetary damages that arose from his work as a cooperating witness in investigating Khaldon Esawi and his associates are "specifically barred by the release." Def.'s Mot. at 29.

---

9. The court need not address whether Mr Aboo's claim falls within the exception to the Tucker Act set forth in *Kania v. United States*, 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981), given Mr. Aboo's inability to come forward with any plausible evidence to indicate that he had a contract with the government providing that his identity would be kept confidential at all times. The Federal Circuit has explained that the decision in *Kania* established that "a claim for money damages for the alleged breach [of a witness protection agreement] may not be maintained unless that agreement clearly and unmistakably subjects the government to monetary liability for any breach." *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed.Cir.2001).

In support of this position, the government relies on the basic principle that in interpreting a contract a court is first to examine the text of the agreement, and, if the text is unambiguous, enforce the plain meaning of the agreement. *Id.* at 28. Here, the language in the release is unequivocal and expressly bars Mr. Aboo's claims against the United States. However, Mr. Aboo alleges that the agreement is unenforceable because it was signed under duress. Pl.'s Resp. at 5.

■ To have a colorable claim of duress, Mr. Aboo must "establish (1) that [he] involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." *North Star Steel Co. v. United States,* 477 F.3d 1324, 1334 (Fed.Cir.2007) (citation omitted). Mr. Aboo claims "he had no choice but to sign" given his dire financial situation at the time and that he informed DEA agents processing his $200,000 award payment of that hardship. Pl.'s Resp. at 7. The government asserts that Mr. Aboo does not have a colorable claim of duress because "the Government was not responsible for providing employment for Mr. Aboo, and did not create Mr. Aboo's financial hardship." Def.'s Reply at 9.

■ Economic distress ordinarily does not constitute coercion, at least where the economic hardship was not caused by the party invoking the release. "A party induced by the want of money, to which the defendant has not contributed, to accept a lesser sum than he claims is due is not under legally recognized economic coercion or duress." *La Crosse Garment Mfg. Co. v. United States* 193 Ct.Cl. 168, 432 F.2d 1377, 1382 (1970); *see also Johnson, Drake & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 531 F.2d 1037, 1042 (1976) ("Economic pressure and even the threat of considerable financial loss are not duress." (internal quotations omitted)). In this respect, Mr. Aboo has put

forward no evidence to indicate his financial hardship was the result of the government acting in a wrongful or improper manner. *See Aircraft Assocs. & Mfg. Co. v. United States,* 174 Ct.Cl. 886, 357 F.2d 373, 379 (1966) (finding a valid claim of economic duress when the government had breached a valid contract and thereby had "contributed to plaintiff's financial difficulties").[10]

■ Correlatively, the coercion element of duress can arise where a party shows that "the Government's action was wrongful—*i.e.*, that it was (1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." *Rumsfeld v. Freedom NY, Inc.,* 329 F.3d 1320, 1330 (Fed.Cir.2003) (citations omitted). There is no evidence that the DEA or its agents acted illegally. In short, Mr. Aboo has failed to come forward with any evidence that raises an issue of material fact concerning whether the government committed a wrongful act that caused or contributed to his financial hardship. Therefore, Mr. Aboo's claim of duress fails and the release agreement he signed is valid and enforceable.

## CONCLUSION

For the reasons stated, the government's motion for summary judgment is GRANTED. The Clerk shall enter judgment for the defendant. No costs.

It is so ORDERED.

---

10. In *Aircraft Assocs.*, the Court of Claims found a valid claim of duress to exist because the government had inappropriately caused removal of parts from airplane carcasses from which a purchasing plaintiff was to salvage usable components and recover aluminum from the remainder. 357 F.2d at 378–79. By contrast, when extraneous events rather than the government's wrongful acts cause the financial difficulties, no coercion has been found. *See Dureiko v. United States,* 209 F.3d 1345, 1358 (Fed.Cir.2000) (addressing damage caused by Hurricane Andrew in 1992).