Amin JUMAH,[1] Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 08–862C.

United States Court of Federal Claims.

Dec. 23, 2009.

---

**1.** Amin Jumah is also known as "Amen Juma" and "Amin Esawi." *See* Criminal Compl., *United*

*States v. Jumah,* No. 04 Cr. 237–1 (N.D.Ill.2007).

Amin Jumah, Fort Dix, NJ, pro se plaintiff.

Jeffrey A. Regner, U.S. Department of Justice, Washington, DC, with whom were Tony West, Assistant Attorney General, and Jeanne E. Davison, Director, for defendant.

## OPINION

FIRESTONE, Judge.

This case comes before the court on the motion of the defendant, the United States ("government"), to dismiss the claims brought by the plaintiff, Amin Jumah ("Mr. Jumah"), for lack of jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). Mr. Jumah claims that the government owes him payment for information he provided to the Drug Enforcement Agency ("DEA"[2]) in April 2003. He also alleges various tort and

---

**2.** For convenience, "government" is used to refer specifically to the DEA where it is clear from the context that "government" refers to the DEA.

Constitutional claims. For the reasons that follow, the government's motion to dismiss is GRANTED pursuant to RCFC 12(b)(1) with regard to Mr. Jumah's tort and Constitutional claims and RCFC 12(b)(6) with regard to Mr. Jumah's contract claims.

## BACKGROUND FACTS

The following facts are taken from the pleadings and are undisputed unless otherwise noted. For several years, Mr. Jumah served on and off as a confidential source ("CS") to the DEA, providing information regarding drug deals. Although not all of this information was of use to the DEA, some of this information proved valuable and resulted in arrests and drug and asset seizures. Mr. Jumah's contributions to the DEA's efforts were conducted pursuant to a series of CS agreements ("CSAs") signed by Mr. Jumah and DEA representatives during this period. Each of these agreements included a clause stating, "I understand that although I may be eligible for compensation for my services, the DEA reserves the exclusive right to determine whether I will receive any payment or compensation and to determine the amount of such payment or compensation." *See, e.g.,* Ex. A to Def.'s Mot. Dismiss ("Mot.Dismiss") at A3, A4. With the exception of the first agreement, each of these agreements was valid for up to one year. *See, e.g., id.* (valid May 13, 2002 to May 13, 2003), Ex. D to Ptf.'s Reply[3] (agreement signed September 25, 2001 with no effective dates included other than statement that agreement is "not to exceed one year"). The most recent CSA between Mr. Jumah and the DEA provided to this court was signed October 11, 2002 and states that it would be effective through October 11, 2003. Ex. G to Ptf.'s Reply.

At several points throughout this period, Mr. Jumah was "deactivated" as a confidential source during periods when he was unable to provide useful information. He would then be "reactivated" when his information again became of use, and a new CSA would be signed. Mr. Jumah admits that he "was ultimately deactivated in December 2002." Ptf.'s Reply 4.

According to DEA documents provided by Mr. Jumah, the authenticity of which is not disputed by the government, the DEA made at least eight payments to Mr. Jumah between September 27, 2001 and March 27, 2003 for information he provided in 2001 and 2002. Ex. F to Ptf.'s Reply. These payments ranged from $100 to $29,800 and totaled $51,900. *Id.*

On March 2, 2004, while deactivated, Mr. Jumah was arrested for selling pseudoephedrine[4] to someone who turned out to be an active CS for the DEA. *United States v. Jumah,* 493 F.3d 868, 870 (7th Cir.2007). Mr. Jumah unsuccessfully claimed that he was acting as a CS when he made this sale. *Id.* at 870. He was ultimately sentenced to 151 months' imprisonment.[5]

In the instant case, Mr. Jumah "seek[s] to recover his 20 percent of the NORTHERN STAR OPERATION,[6] ... $15 Million ... in com[p]ensatory damages, $25 Million ... in Punitive damages and $25 Million ... for Intentional Infliction of Emotional Distress." Compl. ¶ 9. He also seeks U.S. citizenship. *Id.* In his reply to the government's motion to dismiss, Mr. Jumah elaborates on his tort claims, claiming compensation for "[n]eglect, [m]isrepresentation, [f]alse [i]mprisonment, [c]onspiracy, [i]ntentional [i]nfliction of emotional [d]istress, [i]nvasion of [p]rivacy, [n]egligence and [t]respass and [p]unitive [d]am-

---

3. While this brief, filed in response to the government's motion to dismiss, would normally be referred to as a response brief and not a reply brief, the court shall use the plaintiff's wording for ease of reference.

4. Pseudoephedrine, the active ingredient in over-the-counter medications such as Sudafed, is used in the production of methamphetamine.

5. The case was remanded to the district court and is currently before the Seventh Circuit on a second appeal. However, that litigation has no apparent bearing on the claims pending in this court. The plaintiff's claim for compensation includes operations that are separate from those that resulted in his conviction.

6. Operation Northern Star targeted the illegal importation of pseudoephedrine into the United States for the production of methamphetamine. U.S. Drug Enforcement Administration, http://www.justice.gov/dea/major/northern_star/index.html (last visited Dec. 23, 2009).

ages." Ptf.'s Reply to Mot. Dismiss ("Ptf.'s Reply") 11. Mr. Jumah provided this court with documentation to support his claims, and he requests the opportunity to provide this court with further evidence, including "[s]tatements, [w]itnesses information, [a]udio tapes, and other sens[i]tive government (DEA) information." Ptf.'s Reply B.

In response, the government has moved to dismiss Mr. Jumah's contract claims pursuant to RCFC 12(b)(1) and 12(b)(6) on the following grounds:

> (1) the period of time for which [Mr. Jumah] demands compensation (April[ ] 2003) is after the DEA terminated its contract with him, and (2) the alleged written contract does not provide for compensation. Further, the amended complaint fails to state a claim upon which this Court can grant relief for breach of implied-in-fact contract because [Mr. Jumah] states neither the terms of the contract nor the person with whom he entered into the contract.

Mot. Dismiss 2. Additionally, the government moves this court to dismiss Mr. Jumah's tort and Constitutional claims pursuant to RCFC 12(b)(1) and 12(b)(6). *Id.*

## STANDARD OF REVIEW

The standard for ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is well-settled. The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998) (*citing McNutt v. Gen. Motors,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds,* 846 F.2d at 748. Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted)); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). *See generally John R. Sand & Gravel v. United States,* 552 U.S. 130, 128

S.Ct. 750, 169 L.Ed.2d 591 (2008). It is well-settled that when the court considers a motion to dismiss for lack of subject matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991).

In addition, the standard for a motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6) was recently discussed by the Federal Circuit in *Colida v. Nokia, Inc.,* 2009 WL 3172724 (Fed.Cir.2009), following the Supreme Court's decisions in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In *Colida,* the court stated that "the complaint must have sufficient 'facial plausibility' to 'allow the court to draw the reasonable inference that the defendant is liable.'" *Colida,* 2009 WL 3172724 at *1 (quoting *Iqbal,* —— U.S. at ——, 129 S.Ct. at 1949 (internal brackets removed)). Finally, "while the Court will generously construe a pro se complaint, a pro se plaintiff still must establish the requisite elements of his claim." *Humphrey v. United States,* 52 Fed. Cl. 593, 595 (2002) (citing, e.g., *Sanders v. United States,* 252 F.3d 1329, 1333 (Fed.Cir. 2001)).

## DISCUSSION

### I. The Court Has Jurisdiction over Mr. Jumah's Contract–Based Claims Only.

#### A. Mr. Jumah Is Not Collaterally Estopped from Claiming that He Had a Contract with the Government.

The court begins with the government's argument that Mr. Jumah is collaterally estopped from asserting breach of contract because his conviction in the Federal District Court for the Northern District of Illinois necessarily contained the finding that he did not have a contract with the government. Mot. Dismiss 6. The court begins with the issue of estoppel because Mr. Jumah's contract-based claims provide the only potential basis for jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000) ("The United States Court of Federal Claims shall have

jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages *in cases not sounding in tort.*" (emphasis added)).

■ As the government correctly notes, four criteria must be met to establish issue preclusion:

(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues. *Mintzmyer v. Dep[']t of Interior,* 84 F.3d 419 (Fed.Cir.1996); *Shell Oil Co. v. United States,* 86 Fed.Cl. 470 (Mar[.] 31, 2009); *Goist v. United States,* 85 Fed.Cl. 726 (2009).

Mot. Dismiss 6–7. A careful review of the facts demonstrates why the court cannot hold that the Seventh Circuit litigation estops Mr. Jumah from claiming to have had a contract with the government in the instant case. During his criminal trial, Mr. Jumah claimed to have had a contract with the government in March 2004. In this case, Mr. Jumah claims to have had a contract with the government in April 2003, eleven months before the events that led to Mr. Jumah's conviction took place. The government has not addressed the fact that these two time periods are different. A finding that Mr. Jumah did not have a contract with the government in March 2004 does not have a bearing on whether or not he had a contract with the government in April 2003.

Indeed, the activities Mr. Jumah claimed were covered by his contract with the DEA in his criminal case are different than those involved in the case at bar. In his criminal case, Mr. Jumah claimed he was acting under public authority when he sold drugs to another man who turned out to be a government informant. *Jumah,* 493 F.3d at 870. However, in the case before this court, Mr. Jumah claims that he is entitled to compensation for providing the government with information in connection with the Northern Star Operation. Even if the time frame were the same in both cases, these are two different activities, and a finding that Mr. Jumah did not have a contract to do one is not the same as a finding that he did not have a contract to do the other. Accordingly, the court finds that the government has not established that Mr. Jumah's contract claims are barred by the doctrine of collateral estoppel.

*B. This Court Does Not Have Jurisdiction Over the Plaintiff's Claims Sounding in Tort and His Constitutional Claims Are Not Money–Mandating.*

■ As noted above, under the Tucker Act, the Court of Federal Claims has jurisdiction to hear claims that are "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages *in cases not sounding in tort.*" 28 U.S.C. § 1491(a)(1) (emphasis added). The Tucker Act does not, by itself, create a right to money damages against the United States. Rather, the substantive right to money damages against the United States must extend from the Constitutional provision, statute, contract, or regulation giving rise to the claim. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). *See also James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998) ("What this means is that a Tucker Act plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (internal citations omitted)).

As an initial matter, it is well-established that the Court of Federal Claims does not have jurisdiction over tort claims. Here, Mr. Jumah seeks damages for "[n]eglect, [m]isrepresentation, [f]alse [i]mprisonment, [c]onspiracy, [i]ntentional [i]nfliction of emotional [d]istress, [i]nvasion of [p]rivacy, [n]egligence and [t]respass and [p]unitive [d]amages." Ptf.'s Reply 11. These are all claims sounding in tort.

In his reply brief, Mr. Jumah tries to characterize these tort claims as contract claims on the theory that "he was placed in a prison and not a Camp because he did not have his U.S. citizenship." Ptf.'s Reply at 11. Although parts of his filings are difficult to follow, it appears that under Mr. Jumah's theory, he would have been imprisoned in a different facility, a "camp" instead of a "prison" (although this court does not understand the distinction), had the government granted him U.S. citizenship as it allegedly promised to do under a contract with Mr. Jumah. Had he been placed in a "camp," Mr. Jumah appears to argue, the events that gave rise to these claims would not have taken place. Thus, asserts Mr. Jumah, those claims stem from the government's alleged breach of contract and should be treated not as tort claims, but contract claims.

While this is an interesting theory, the court finds Mr. Jumah's argument unavailing. Mr. Jumah's claims based on "[n]eglect, [m]isrepresentation, [f]alse [i]mprisonment, [c]onspiracy, [i]ntentional [i]nfliction of emotional [d]istress, [i]nvasion of [p]rivacy, [n]egligence and [t]respass and [p]unitive [d]amages." Ptf.'s Reply 11, sound in tort. Accordingly, Mr. Jumah's tort claims are **DISMISSED** pursuant to RCFC 12(b)(1).

■ Mr. Jumah also asserts, "This Amended Complaint that [sic] Mr. Jumah [c]auses of action arose under the FIRST, FOURTH, FIFTH, EIGHTH and NINTH Amendments to the Constitution of the United States of America." Compl. ¶ 8. It is well established that this court has no jurisdiction over claims brought under the First, Fourth, Fifth (Due Process Clause), Eighth and Ninth Amendments because they are not money-mandating. *See Cosma–Nelms v. United States,* 72 Fed.Cl. 170, 172 (2006) ("This Court's jurisdiction only extends to those provisions of the Constitution which are money mandating and does not include claims based on the First Amendment, the Due Process Clause, the Eighth Amendment, or the Equal Protection Clause."); *accord LeBlanc v. United States,* 50 F.3d 1025, 1028 (Fed.Cir.1995); *see also Trafny v. United States,* 503 F.3d 1339, 1339 (Fed.Cir.2007) (the Eighth Amendment is not a money-mandating provision (internal quotation marks omitted)); *LaChance v. United States,* 15 Cl.Ct. 127, 130 (1988) (holding that the U.S. Claims Court, the predecessor to the Court of Federal Claims, lacked jurisdiction over a claim based on the Fourth Amendment because "the fourth amendment does not mandate the payment of money by the United States"); *Russell v. United States,* 78 Fed.Cl. 281, 288 (2007) (holding that the Ninth Amendment is not money-mandating). Accordingly, these claims are **DISMISSED** pursuant to RCFC 12(b)(1).

### C. The Court Has Jurisdiction Over Mr. Jumah's Contract Claims.

■ As stated above, this court has jurisdiction over "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Mr. Jumah contends that a CSA and oral agreements with DEA agents gives rise to contract claims. While the government contests the enforceability of any such contract (or, in the alternative, that any such contract mandates compensation),[7] the government does not dispute that portions of Mr. Jumah's claims are predicated on the theory that he had a contract with the government. Whether the agreements are enforceable is a question to be decided under RCFC 12(b)(6). However, this court holds that it has jurisdiction to determine whether Mr. Jumah's dealings with the DEA give rise to a valid contract and declines to dismiss these claims pursuant to RCFC 12(b)(1).

In this connection, the court notes that in several cases, the Court of Federal Claims has treated CSAs and other similar agreements with cooperating witnesses and informants as contracts with the government and has exercised jurisdiction over cases involving these agreements. For example, in *SGS–92–X003 v. United States,* 74 Fed.Cl. 637, 638 (2006) ("*Princess I*"), a DEA confidential informant code-named "Princess" brought suit against the government, claim-

---

7. Indeed, in its reply brief, the government asserts that the CSA on which Mr. Jumah bases his express contract claims was a written contract. *See* Def.'s Reply 4–5 (arguing that an implied-in-fact contract would have "contradict[ed] the express terms of the CSA").

ing that it breached a contract to pay her a portion of the assets seized as a result of the information she provided. While that case came before the court on cross-motions for summary judgment (and not a motion to dismiss), it is relevant to the current inquiry that the court in *Princess I* did not see fit to even raise the issue of jurisdiction. More recently, in *Aboo v. United States,* 86 Fed.Cl. 618 (2009), the court exercised Tucker Act jurisdiction over a claim brought by Mr. Aboo, who was a CS for the DEA as well as a cooperating witness with the FBI and IRS. In that case, Mr. Aboo provided information relating to Operation Mountain Express II, which, like the operation for which Mr. Jumah provided information for which he now seeks reimbursement, targeted pseudoephedrine trafficking from Canada to the United States.[8] *Id.* at 622. While the court in *Aboo* ultimately granted summary judgment in favor of the government, finding that the plaintiff had not "come forward with plausible evidence that raises an issue of material fact concerning whether he had a valid ... contract with the United States," *id.* at 629, the court nevertheless exercised jurisdiction over the plaintiff's contract claim because it was based on the allegation of a contract with the United States, *id.* at 627. This case presents similar claims and because the claims sound in contract, this court has jurisdiction to consider them.

## II. Mr. Jumah's Contract–Based Claims Must Be Dismissed for Failure to State a Claim.

The court now turns to the issue of whether Mr. Jumah has alleged facts that, if true, would entitle him to relief and preclude dis-

missal under RCFC 12(b)(6). The court finds that he has not done so.

Mr. Jumah has alleged that both a written contract and an implied-in-fact contract entitle him to payment for the information he provided. The court will examine these allegations in turn.

### A. Mr. Jumah Has Not Pled Facts to Show that a Written Contract Provided the Relief Sought.

As stated above, in order to avoid dismissal for failure to state a claim, "the complaint must have sufficient 'facial plausibility' to 'allow the court to draw the reasonable inference that the defendant is liable.'" *Colida,* 2009 WL 3172724 at *1 (quoting *Iqbal,* —— U.S. at ——, 129 S.Ct. at 1949 (internal brackets removed)). In this connection, Mr. Jumah has provided this court with copies of the CSAs he signed with the government. The most significant of these is the CSA signed in October 2002. While the CSA states that it was to be valid until October 2003, the parties agree that it was actually terminated in December 2002. *See* Ptf.'s Reply at 4 (Mr. Jumah admits that he "was ultimately deactivated in December 2002"); Mot. Dismiss 2 ("This court should dismiss Mr. Jumah's breach of contract claim because ... the period of time for which he demands compensation ... is after the DEA terminated its contract with him ...."). The parties further agree that no written agreement was in place at the time Mr. Jumah provided the information for which he now seeks payment. Given that Mr. Jumah freely admits that he had no written contract in place at the time he provided his information, the court holds that Mr. Jumah has failed to state a claim based on a written contract theory.[9]

---

8. Indeed, Mr. Jumah claims involvement with Operations Mountain Express I & II, as well. Ex. G to Ptf.'s Reply at 33.

9. Although this holding obviates the need for a thorough discussion of the terms of the October 2002 CSA, it is worth noting that the last written agreement between Mr. Jumah and the government did not obligate the government to pay Mr. Jumah or provide him with any other sort of assistance, including U.S. citizenship.

 The standard-form CSA that Mr. Jumah signed on October 11, 2002 makes no promises of compensation, assistance, or other consideration

from the government in exchange for assistance provided by the CS. Of particular relevance to Mr. Jumah's case are the following provisions:
9. "I understand that although I may be eligible for compensation for my services, *the DEA reserves the exclusive right to determine whether I will receive any payment or compensation* and to determine the amount of such payment or compensation."
11. I understand that *no promises may be made,* other than by the Immigration and Naturalization Service (INS), regarding my immigration status or right to enter or remain in the United States.

*B. The Plaintiff Has Not Stated a Claim under an Implied–in–Fact Contract Theory.*

In addition to claiming an entitlement to compensation pursuant to a written contract, the plaintiff claims that he had an implied-in-fact contract with the government.

"An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hercules Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *see also Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1259 (Fed.Cir.2005); *La Van v. United States,* 382 F.3d 1340, 1346 (Fed.Cir. 2004). In order to prove an implied-in-fact contract with the government, the plaintiff must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the Government in contract on the part of the government representative whose conduct is relied upon. *Flexfab,* 424 F.3d at 1258; *see also Princess I,* 74 Fed.Cl. at 650–53 (2006) (discussing implied-in-fact contracts between a confidential informant and the DEA); *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Mr. Jumah predicates his implied-in-fact contract claims on three theories. First, he claims that at the time he signed a written contract, "[T]he DEA agents inform [sic] Mr. Jumah that all other promises [sic], such as the 20 percent [share of seized assets] and the help with Mr. Jumah['s] [c]itizenship and passport, will be as an Oraly [sic] add[-]on to the contract." Compl. ¶ 7. Second, he claims that a course of dealing with the DEA supports the existence of an implied-in-fact contract. The primary support he provides for

this contention is the fact that he was paid for information he provided while deactivated in May 2002. Finally, he claims that a conversation he had with Special Agent ("SA") Jim Loring ("SA Loring") on April 17, 2003 demonstrates the existence of an implied-in-fact contract.

*1. Oral Statements Made at the Time the October 2002 CSA Was Signed*

The government argues that the alleged oral promises Mr. Jumah seeks to enforce directly contradict a written CSA and are therefore unenforceable. As such, the government argues that Mr. Jumah cannot rely on these statements to state a breach of contract claim. Def.'s Reply 3–4. The court agrees.

"It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002). Mr. Jumah's assertion that oral statements made by the government at the time the CSA was signed created an implied-in-fact contract must fail pursuant to *Schism,* 316 F.3d at 1278. This is because the written contract (the CSA) deals with the same subject matter as the alleged implied-in-fact, oral contract: the compensation Mr. Jumah would receive in exchange for the information provided. Even if DEA agents did make the statements that Mr. Jumah alleges, those statements are clearly in contradiction of a contemporaneously-executed, written agreement. *See Ruttenburg v. United States,* 65 Fed.Cl. 43, 49 (2005) (holding that a government representative's oral promises of a higher level of compensation were unenforceable where a written agreement provided a lower amount of compensation). Therefore, any promises that were made to Mr. Jumah at the time he signed the October 2002 CSA did not create an implied-in-fact contract.[10]

Ex. A to Mot. Dismiss at A4 (emphasis added). These provisions clearly provide that the any provision of compensation to Mr. Jumah is at the government's sole discretion; no compensation is mandated or required under this agreement.

10. Furthermore, even if the court were to hold that these oral promises were incorporated into the October 2002 CSA, they would have been terminated with the rest of the CSA in December 2002.

### 2. Course of Dealing

██ The court now turns to Mr. Jumah's allegations of a course of dealing with the DEA that demonstrates that he had an implied-in-fact contract to pay him for his work with the DEA.

The allegations demonstrate that Mr. Jumah provided the DEA with valuable information for which he was compensated on multiple occasions. Apparently, on May 8, 2002, Mr. Jumah was paid for information he provided while deactivated (i.e., while he was not under a CSA with the DEA). *See* Ex. F to Ptf.'s Reply 1–9 (DEA documents regarding this event). Mr. Jumah does not allege any other occasions on which he was compensated for providing information without a CSA in place.

As stated above, an agreement in fact is "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Goist,* 85 Fed.Cl. at 739 (quoting *Hercules,* 516 U.S. at 423, 116 S.Ct. 981) (quoting-in-turn *Baltimore & Ohio R.R.,* 261 U.S. at 597, 43 S.Ct. 425 (internal quotation marks omitted)). The court finds that this single instance of the DEA paying Mr. Jumah for information he provided without a CSA being in place does not constitute a course of dealing between Mr. Jumah and the DEA sufficient to create an implied-in-fact contract. Mr. Jumah would have this court understand that this solitary instance constitutes "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding" that Mr. Jumah would be paid for information he provided to the government, whether or not a written CSA was in place at the time. *Goist,* 85 Fed.Cl. at 739. The surrounding circumstances allow for no such inference. First, Mr. Jumah himself states that "[t]he [DEA] agents decided to move forward with the deal without first activating Jumah because the dealer was ready to do the deal that same day." Ptf.'s Reply at 5. Given Mr. Jumah's acknowledgment of the urgency of the situation combined with the fact that this was the only occasion on which he provided information for which he was later compensated without a CSA in effect, the court cannot hold that a course of dealing supports an implied-in-fact contract. Second, Mr. Jumah provides only one instance in which such a payment took place. A single instance, without evidence of others, does not a *course* of dealing make. Therefore, he has not stated a plausible claim on this ground.

### 3. The Conversation with SA Loring

██ Finally, the court examines Mr. Jumah's contention that his alleged April 17, 2003 conversation with SA Loring created an implied-in-fact contract with the DEA. As an exhibit to his reply brief, Mr. Jumah included a statement he drafted and dated January 9, 2004. Ex. G to Ptf.'s Reply 33–35. Although it is not clear for whom Mr. Jumah originally prepared this statement, it appears that he prepared it to support his claim for payment. The statement includes a transcript, apparently prepared by Mr. Jumah, of a call between himself and SA Loring on April 17, 2003. The court reproduces here that transcript without alteration:

> (AMIN) YES CAN YOU HERE ME (JIM [Loring]) I CAN HERE YOU (AMIN) OK NOW IS BUTER (JIM) OK (AMIN) SO I TALKE TO KASMO[11] HE ASK ME TO CALL JIMY HE IS NOT GOING TO FORGET ABOUT YOU (JIM) NO DON'T WORY I TAKE CARE OF YOU MAN JUST WE DON'T KNOW MUTCH WE HAVE YET ITS GOING TO BE LETIL A WILE (AMIN) OK (JIM) I AM NOT GOING TO FOR GET YOU O WRITE, (AMIN) *I GET MY PRESINTAGE* (JIM) *YES YOU GETPRESINTSGE* YES I WILL GEVE YOU A CALL TWOMORROW (AMIN) DON'T FORGET ME (JIM) I WON'T BROTHER (AMIN) THANK YOU JIM (JIM) ALL RITE, ALL RITE

*Id.* at 35 (emphasis added).

Assuming that, as Mr. Jumah claims, this conversation referred to the information Mr. Jumah provided in April 2003, the court understands that Mr. Jumah thought that he

---

**11.** "Kasmo" appears to refer to DEA Task Force Officer John Kosmowski.

would be receiving a percentage of assets seized (which the court will refer to as a "commission"). However, even assuming *arguendo* that this conversation demonstrates that a DEA SA promised Mr. Jumah a commission, it fails to demonstrate the existence of an implied-in-fact contract between Mr. Jumah and the government because Mr. Jumah has not alleged that SA Loring had the requisite authority to enter into such a contract.

 In order to create a binding contract with the federal government, the government's representative must have actual authority to enter into the contract. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). Actual authority may be express or implied. *Anderson v. United States,* 344 F.3d 1343, 1353 n. 3 (Fed.Cir. 2003); *see also Princess I,* 74 Fed. Cl at 651–53 (discussing the requisite authority a DEA representative must have to bind the DEA in contract); *SGS–92–X003 v. United States,* 85 Fed.Cl. 678, 704 (2009) ("*Princess II*") (same). "A government agent possesses express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." *Tracy v. United States,* 55 Fed.Cl. 679, 682 (2003) (quoting-in-turn *McAfee v. United States,* 46 Fed.Cl. 428, 435 (2000); *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001); *Roy v. United States,* 38 Fed.Cl. 184, 188 (1997)); *accord, City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990) ("the issue is not whether some authority exists that prohibits [the agent] from obligating the Government in contract; rather, *the issue is whether [the agent] had been granted the authority to affirmatively obligate the Government*" (emphasis added)). Implied actual authority "is restricted to situations where 'such authority is considered to be an integral part of the duties assigned to a government employee.'" *Aboo,* 86 Fed.Cl. at 627 (quoting *Landau,* 886 F.2d at 324 (internal brackets omitted)). "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Merrill,* 332 U.S. at 384, 68 S.Ct. 1; *see also*

*Aboo,* 86 Fed.Cl. at 627 (applying *Merrill* in the context of a claimed implied-in-fact contract between an informant and the government).

### i. SA Loring Did Not Have Authority to Authorize Payment From the Asset Forfeiture Fund, 28 U.S.C. § 524 (2002).

Mr. Jumah states that he "base[s] his claim upon his written and [o]ral agreement with the DEA agents, and representation[s] that he alleged were made to him by various government agents and representatives[.]" Compl. ¶ 9. He then states:

The government shall make the payment and pay the reward to Mr. Jumah, *because the statutory conditions for recovery are met, and the statute would be money[-]m[a]ndating* and the Court would be within the Jurisdiction Act to grant the relief sought. Plaintiff, entitled as of right to payment of the award [sic], and if the government refused to pay it, the Informer, Mr. Jumah, had the right to file suit in Court to compel that payment.

*Id.* ¶ 11 (emphasis added). *See also* Ptf.'s Reply 7 ("Plaintiff[ ] ... has proved to this Honorable Court that he met the *statutory conditions* for recovery ...." (emphasis added)). The court interprets this to mean that Mr. Jumah is claiming that the government entered into the alleged implied-in-fact contract pursuant to statutory authority. Although he cites no particular statute, the government notes in its motion to dismiss that "claimants often seek recovery under 28 U.S.C. § 524(c)(1)(B) [(2002)]," which the court will refer to as the Asset Forfeiture Fund Statute (or simply "the statute"). The statute states, in pertinent part:

(c)(1) There is established in the United States Treasury a special fund to be known as the Department of Justice Assets Forfeiture Fund (hereafter in this subsection referred to as the "Fund") which shall be available to the Attorney General without fiscal year limitation for the following law enforcement purposes—

[. . .]

(B) the payment of awards for information or assistance directly relating to violations of the criminal drug laws of the United States or of sections 1956 and 1957 of title 18, sections 5313 and 5324 of title 31, and section 6050I of the Internal Revenue Code of 1986[.]

28 U.S.C. § 524. However, as the government correctly notes, the next section of the statute states that the payment of any such award is discretionary:

(2) Any award paid from the Fund, as provided in paragraph (1)(B) or (C), shall be paid *at the discretion* of the Attorney General or his delegate, under existing departmental delegation policies for the payment of awards, except that the authority to pay an award of $250,000 or more shall not be delegated to any person other than the Deputy Attorney General, the Associate Attorney General, the Director of the Federal Bureau of Investigation, or the Administrator of the Drug Enforcement Administration. Any award pursuant to paragraph (1)(B) shall not exceed $500,000. Any award pursuant to paragraph (1)(C) shall not exceed the lesser of $500,000 or one-fourth of the amount realized by the United States from the property forfeited, without both the personal approval of the Attorney General and written notice within 30 days thereof to the Chairmen and ranking minority members of the Committees on Appropriations and the Judiciary of the Senate and of the House of Representatives.

28 U.S.C. § 524(c)(2) (emphasis added). In this case, Mr. Jumah seeks $15 million in compensation as well as a twenty percent commission. As this latter section of the statute makes clear, any payment from this Fund of $250,000 or more must receive high-level approval. Mr. Jumah does not allege the existence of such approval.

In *Princess I*, the court explained the effect of this statute on a DEA employee's authority to bind the government in a contract to pay a commission to an informant. *Princess I*, 74 Fed.Cl. at 651. The case concerned a DEA confidential informant, code-named "Princess," who was married to

a high-level member of the Cali drug cartel. Princess claimed to have an implied-in-fact contract with the DEA under which it would pay her twenty-five percent of the value of funds and property her information helped the DEA to seize. *Id.* at 650. Princess alleged that the Assistant Special Agent in Charge of the DEA's Fort Lauderdale, Florida field office ("the ASAC") entered into this agreement with her on behalf of the government. The parties filed cross-motions for summary judgment.

The court first examined the issue of whether the ASAC had express actual authority to enter into the agreement. Noting that "[a] Government agent possesses express actual authority to bind the Government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms," *id.* at 651 (citing *Tracy*, 55 Fed. Cl. at 682) (quoting-in-turn *McAfee*, 46 Fed.Cl. at 435) the court found that under the Asset Forfeiture Fund Statute, 28 U.S.C. § 524, "the law is clear that [the] ASAC ... lacked the authority to promise Plaintiff a commission paid from the Asset Forfeiture Fund ...," *id.* (citing, e.g., *Salles v. United States*, 156 F.3d 1383, 1384 (Fed.Cir.1998)) (the Asset Forfeiture Fund Statute "does not authorize payment promises providing for a percentage of all seizures"); *Brunner v. United States*, 70 Fed. Cl. 623, 641 (2006); *Cruz–Pagan v. United States*, 35 Fed.Cl. 59–60 (1996) (refusing to enforce an alleged promise to pay an award of twenty-five percent of the value of any property seized or forfeited from the Asset Forfeiture Fund because the "statutory authority provided that the payment of such award is purely discretionary.").

Based on the long history of cases interpreting the Asset Forfeiture Fund Statute, there can be no question that SA Loring lacked express actual authority to promise Mr. Jumah a commission under the Asset Forfeiture Fund Statute.

*ii. SA Loring Did Not Have Authority to Authorize Payment of a Commission under the DEA Agent's Manual.*

The finding that SA Loring lacked authority to contract with Mr. Jumah under the

Asset Forfeiture Fund Statute to provide him a commission does not end the court's inquiry. Courts have acknowledged that the Asset Forfeiture Fund Statute is not the only authority under which the government can create contracts to provide compensation to informants. Because payments may come from sources other than the Asset Forfeiture Fund, the Asset Forfeiture Fund Statute is not controlling in all cases involving payments to informants. Therefore, courts have examined the issue of whether provisions of the DEA Agent's Manual ("DEA Manual" or "the Manual") grant DEA employees the express actual authority to promise commissions to informants.[12] Section 6612.43 of the DEA Manual provides that "DEA can pay an informant a commission based upon some percentage of the value of cases he provides." DEA Agent's Manual § 6612.43. As the court noted in *Princess I*, this section "is silent with regard to what level DEA official may pay an informant such a commission." *Princess I*, 74 Fed.Cl. at 651. The *Princess I* court determined, however, that because this provision of the DEA Manual is unclear as to what level employee is granted this authority, "it certainly does not constitute an unambiguous grant of express actual authority to bind the Government...." *Id.* at 652. Thus, as was the case in *Princess I*, the DEA Manual provides no authority for the DEA agent's promise to pay the plaintiff.

 *iii. SA Loring Did Not Have Implied Actual Authority to Promise Mr. Jumah a Commission.*

Finally, the court holds that SA Loring did not have implied actual authority to promise

Mr. Jumah a commission. A government official has implied actual authority to bind the United States in contract only when "such authority is considered to be an integral part of the duties assigned to a government employee." *H. Landau & Co.*, 886 F.2d at 324 (quoting Cibinic & Nash, *Formation of Government Contracts* 43 (1982)) (internal brackets removed).

The Federal Circuit has held that contracting authority is not an integral part of the duties assigned to a DEA agent. *Salles*, 156 F.3d at 1384; *see also Tracy*, 55 Fed.Cl. at 683–84; *Doe v. United States*, 48 Fed.Cl. 495 (2000); *Khairallah v. United States*, 43 Fed. Cl. 57, 63–64 (1999); *Cruz–Pagan*, 35 Fed.Cl. at 63. Mr. Jumah has not alleged any facts to make a plausible claim to the contrary. Accordingly, Mr. Jumah has not stated a claim based on any implied-in-fact agreement Mr. Jumah may have had with the DEA.[13],[14]

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss is **GRANTED** pursuant to RCFC 12(b)(1) and RCFC 12(b)(6). Accordingly, the Clerk of the Court is directed to enter judgment for the government. Each party is to bear its own costs.

**IT IS SO ORDERED.**

---

**12.** Although courts have noted the question of whether provisions of the DEA Manual can properly be considered "regulations" that may provide authority to contract, *see, e.g., Brunner v. United States*, 70 Fed.Cl. 623, 645 (2006) (finding that the DEA Manual "is not a published regulation accessible to the public"), courts have nevertheless examined its provisions when discussing grants of contracting authority to DEA agents, *see, e.g., Princess I*, 74 Fed.Cl. at 651–52.

**13.** The court also holds today that there was no implied-in-fact agreement to provide Mr. Jumah with U.S. citizenship. Mr. Jumah appears to base this claim solely on the allegation that at the time he signed the October 2002 CSA, "the DEA agents inform [sic] Mr. Jumah that all other promises [sic], such as ... the help with Mr.

Jumah['s] [c]itizenship and passport, will be as an Oraly [sic] add[-]on to the contract." Compl. ¶ 7. Because the court holds, for reasons explained above, that any such statements are unenforceable, Mr. Jumah's claim for citizenship is **DENIED.**

**14.** Finally, it is possible that Mr. Jumah also claims that Task Force Officer Kosmowski promised him a commission, although Mr. Jumah's prose makes it difficult to discern whether he is, in fact, making this claim. *See* Ex. G to Ptf.'s Reply 35. However, it is the court's understanding that the duties and supervisory authority of Task Force Officers are similar to those of SAs. Thus, the foregoing analysis is applicable to TFO Kosmowski's contracting authority, as well.