**HORN & ASSOCIATES, INC.,** Plaintiff,

v.

**UNITED STATES,** Defendant.

No. 08–415C.

United States Court of Federal Claims.

March 20, 2012.

William H. Gammon, Nelson Mullins Riley & Scarborough LLP, Raleigh, N.C., for the plaintiff. With him was Kelli G. Hopkins, Nelson Mullins Riley & Scarborough LLP, Raleigh, N.C., of counsel.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant.

**OPINION**

HORN, Judge.

**FINDINGS OF FACT**

The plaintiff, Horn & Associates, Inc. (Horn), is a recovery audit firm. Recovery audit firms, like Horn, identify payment errors and provide assistance in the recovery of the erroneous payment from the supplier or contractor that received the erroneous payment. The General Services Administration (GSA) awarded Contract No. GS–23F–0258N to Horn for the furnishing of "Recovery Audits." The GSA Contract was a blanket purchase agreement, pursuant to which various executive agencies could solicit offers to contract for recovery auditing services.

The National Aeronautics and Space Administration (NASA) issued Request for Quote NNH04068239Q (the RFQ)[1] for Audit Recovery Services, and the Contracting Officer issued the RFQ to four companies, including Horn. As indicated in the Contracting Officer's cover letter to the four companies:

> National Aeronautics and Space Administration (NASA) is requesting offers under Request For Quote (RFQ) NNH04068239Q for Audit Recovery services described in the attached Statement of Work (SOW). NASA intends to acquire these services by competing this requirement among several sources on the GSA Federal Supply Schedule Contract, Schedule Number 520 SIN 9, entitled "Financial and Business Solutions (FABS)." Your company is being solicited since it appears on the GSA FABS Schedule's list of eligible contractors.

A Statement of Work was attached to the RFQ, which stated: "[t]he contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003. The audits will be conducted on payments made from *all fixed priced contracts.*" (emphasis added).

NASA received two proposals in response to the RFQ, one from Horn and one from Connolly Consulting, Inc. (Connolly Consulting). In the Memorandum for the Record, for the "Award of Contract NNH05CC28D to Horn and Associates, Inc.," the Contracting Officer stated, "the proposal received from Connolly Consulting was considered to be non-compliant with the requirements of the RFQ. Connolly Consulting did not provide a contingency fee with a fixed percentage [of recovery], but instead proposed an estimated contingency fee range conditioned upon additional information...." As a result, Horn was the only responsive offeror. In its proposal, Horn stated that, in its opinion, NASA needed "a 100% look at the Department's data to gain the full benefit of the recovery audit" and that Horn "would like to have access to *all* contracts, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc." (emphasis added). The Contracting Officer noticed a discrepancy in the option periods, specifically option year one, in Horn's proposal, and requested that Horn acknowledge the option years as stated in the RFQ. By email, Horn acknowledged and agreed to the option years as stated in the RFQ.

NASA awarded Order for Supplies or Services, Order No. NNH05CC28D (the Order)[2] to Horn for recovery audit services on December 23, 2004. The Order was issued pursuant to the GSA blanket purchase agreement. The Order did not incorporate by reference the NASA RFQ, but stated it was "subject to all the terms and conditions of the contractor's GSA Schedule Contract GS–23F–0258N and as amended by the clauses contained herein." Included as an attachment to the Order was a Statement of Work. The Order's Statement of Work indicated: "[t]he contractor shall perform a primary audit recovery on *all* contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." (emphasis

---

1. The parties also refer to the Request for Quote NNH04068239Q as the Solicitation.

2. The parties also refer to the Order (Order No. NNH05CC28D) as the Contract.

added). The Order also included a unilateral option which stated:

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

The Order further stated, "[t]he Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the schedule." The Order included four option years to extend the term of the audit recovery period.

On February 8, 2005, Horn participated in a pre-audit, planning meeting at NASA headquarters. On March 4, 2005, after the pre-audit planning meeting, an internal NASA memorandum was issued by Gwendolyn Sykes, NASA's Chief Financial Officer, to all NASA Centers, which indicated that Horn was to audit "payment records of *fixed price contracts*." (emphasis added). The Contracting Officer technical representative, Melvin DenWiddie, issued an email to all NASA Centers on May 18, 2005, stating the Order was for the audit of "*all* contract payments." (emphasis added). NASA provided Horn with payment data for *all* contracts, not just payment data for fixed price contracts, for Horn's recovery audit.

On September 8, 2005, the Order was extended for one year through September 30, 2006 by an "Amendment of Solicitation/Modification of Contract," with all terms but the dates of the Order remaining the same.[3] The description of the Modification stated in its entirety:

The purpose of this modification exercises Option 1 to conduct Audit Recovery for the period of 2004–2005 as identified in Item 13 of the basic order [the option to extend the term of the contract].

1. Clause 7, PERIOD OF PERFORMANCE, shall commence on the effective date of this contract through *September 30, 2006*.

2. The total value of this order remains unchanged.

All other terms and conditions remain the same.

(Emphasis in original).

On July 17, 2006, Terry Bowie, Deputy Chief Financial Officer of NASA, indicated to NASA's Johnson Space Flight Center that, "I have asked the legal people to look into suspending the contract until we have settled out on the issues raised by Horn in terms of what the contract calls for and what they are entitle[d] too [sic] for payment." According to the joint stipulations, on July 24, 2006, NASA Centers were informed that they were to limit Horn's recovery audit to *fixed price contracts only*. Dean Patterson, who had become the Contracting Officer in July 2006, informed Horn on July 31, 2006, well into performance of the option year, that, "[i]n light of performance concerns that NASA has regarding Contract NNH05CC28D, [the Order] you are advised to restrict your current audit recovery reviews to *fixed price contracts*." (emphasis added).

On August 15, 2006, Terry Bowie issued a memorandum to all NASA Centers regarding the March 4, 2005 internal memorandum from Gwendolyn Sykes and stated: "A previous message regarding the program and contract with Horn and Associates, Inc[.] (Horn) indicated the company would be working with each Center to conduct an examination of payment records of only *fixed price contracts*. This limitation is not consistent with language in the NASA–Horn contract. Therefore, Centers please work with Horn to conduct an examination of *all* contracts." (emphasis added).

---

**3.** Although the Amendment of Solicitation/Modification of Contract was signed by Horn on September 1, 2005, the Amendment of Solicitation/Modification of Contract was not signed by the Contracting Officer until September 8, 2005. The Amendment of Solicitation/Modification of Contract stated the effective date is the date signed by the United States.

The Contracting Officer informed Horn on August 24, 2006 that NASA would not exercise a second option year on the Order, and, on September 30, 2006, the period of performance under the Order ended. In a March 13, 2007 letter from the Contracting Officer to Horn, regarding the agency position with respect to issues between Horn and NASA, the Contracting Officer stated, "[w]hile the contract document (citation to SOW) gave Horn the right to review *all* contracts, at this time it is inappropriate to determine if in fact overpayments have taken place on cost-type contracts that have not been completed." (emphasis in original). The Contracting Officer explained, "[t]his is due to the fact that open contracts are still in the administrative phase of open payment cycles."

Horn filed a certified claim with NASA. In the Contracting Officer's written, final decision, NASA denied Horn's claim in its entirety. Prior to the final decision, Horn was not told that an alleged administrative error had been made by the defendant, and that the "*all* contracts" language from an earlier draft version of the Statement of Work, rather than the "*fixed priced contracts*" language of the RFQ, was mistakenly included in the final Order signed by the Contracting Officer. In the final decision, the Contracting Officer acknowledged that no "unilateral corrective administrative modification" had been issued.

Regarding the controversy of whether *all* or only *fixed price contract* audits were within the scope of work for Horn and Associates, early, draft language of the RFQ Statement of Work provided that a "primary audit on *all* contract payments be performed." (emphasis added). On July 14, 2004, in an email, the Contracting Officer indicated that the proposed Statement of Work would be "revised to reflect that ONLY *fixed priced contracts* will be audited." (emphasis added; all caps in original). At a deposition, Janet Langweil, the Contracting Officer who issued the RFQ and made the Order award, testified that "I do not believe in my personal opinion it was the intent to go out for all contracts. I think initially that was, but after legal counsel and policy, I think it was the intent to go for *fixed-price contracts.*" (emphasis added). However, when asked at a deposition if there was a mistake in the award of the Order to complete a recovery audit on *all* contract payments, the Contracting Officer technical representative, Melvin DenWiddie, testified "[n]o, I do not think that was a mistake." (emphasis added).

At his deposition, Terry Bowie was asked why he issued the August 15, 2006 memorandum which stated, in part, the limitation of examining *only fixed price* contracts was "not consistent with the language in the NASA–Horn contract. Therefore, Centers please work with Horn to conduct an examination of *all* contracts." (emphasis added). Mr. Bowie testified it was "[t]o make it clear that Horn was able to look at basically *all* of the contracts." (emphasis added). Similarly, when Bruce Ward of NASA was deposed, he was asked about any limitations on Horn's recovery audit and he testified, "I'm not aware of any limits to the contract, of what they could audit. In fact just the opposite, as I explained earlier, it was an understanding that they were auditing *all* of the payments." (emphasis added).

After the Contracting Officer issued his final decision, Horn filed a complaint in this court. The parties conducted discovery, including depositions, after which, the plaintiff filed a motion for partial summary judgment. Plaintiff claims that the Statement of Work attached to the Order required Horn to perform a primary audit recovery on *all* contract payments for the time period specified in the agreement between the parties. Defendant responds that "the purchase order was for the auditing of *fixed price contracts*," for that same time period because the RFQ was limited to audits "on payments made from *all fixed price contracts.*" (first emphasis added, second emphasis in original). Defendant, therefore, requests the court to deny the plaintiff's motion for partial summary judgment.

## DISCUSSION

Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar, both in language and

effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2011); Fed.R.Civ.P. 56(a) (2012); *see also Alabama v. North Carolina,* ––– U.S. ––––, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed. Cir. 2010); *Consol. Coal Co. v. United States,* 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied,* ––– U.S. ––––, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States,* 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States,* 553 F.3d 1375, 1378 (Fed.Cir. 2009); *Casitas Mun. Water Dist. v. United States,* 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied,* 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2005); *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2004), *cert. denied,* 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Cohen v. United States,* 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States,* 99 Fed.Cl. 607, 610 (2011). A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Thompson v. United States,* 101 Fed.Cl. 416, 426 (2011); *Cohen v. United States,* 100 Fed.Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Walker v.*

*United States,* 79 Fed.Cl. 685, 692 (2008); *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Schlup v. Delo,* 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Cohen v. United States,* 100 Fed.Cl. at 469–70; *Boensel v. United States,* 99 Fed.Cl. at 611; *Macy Elevator, Inc. v. United States,* 97 Fed.Cl. 708, 717 (2011); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States,* 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (Fed. Cir.2002), *published at* 317 F.3d 1331 (Fed. Cir.2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.,* 262 F.3d 1306, 1316 (Fed.Cir. 2001); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result. *Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (quoting *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir. 1992) (citation omitted); *see also Metric Constr. Co., Inc. v. United States*, 73 Fed.Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1375 (Fed.Cir. 2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied*, 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999); *Gonzales–McCaulley Inv. Group, Inc. v. United States*, 101 Fed.Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Ricci v. DeStefano*, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Yant v. United States*, 588 F.3d 1369, 1371 (Fed.Cir.2009), *cert. denied*, —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied*, 293 F.3d 1364 (Fed.Cir. 2002), *cert. denied*, 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1998); *see also Am. Pelagic Co. v. United States*, 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); *Boensel v. United States*, 99 Fed.Cl. at 611 (" 'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348, *Casitas Mun. Water Dist. v. United States*, 543 F.3d at 1283, *Lathan Co. Inc. v. United States*, 20 Cl.Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1374 (Fed.Cir.2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States*, 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 741 (Fed. Cir.1997) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1995)), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997); *Dana R. Hodges Trust v. United States*, 101 Fed.Cl. 549, 553 (2011).

If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed.Cir. 2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d at 1244; *Florida Power & Light Co. v. United States*, 375 F.3d 1119, 1124 (Fed.Cir.2004); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001); *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed.Cir.2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed.Cir.2006).

▮▮▮ After discovery, including depositions of key personnel, the plaintiff filed a motion for partial summary judgment on an issue of contract interpretation. The parties agree on the material facts.[4] Contract interpretation starts with analysis of the language of the written agreement. *See Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir. 1993). The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States*:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

*Jowett Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435, reh'g denied and en banc suggestion declined (Fed.Cir. 1996), and *Harris v. Dep't of Veter-*

*ans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998)); *see also McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1380 (Fed.Cir.2010); *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."); *Marquardt Co. v. United States*, 101 Fed.Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)); *Enron Fed. Solutions, Inc. v. United States*, 80 Fed.Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."). " ' "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *Arko Exec. Servs., Inc. v. United States*, 553 F.3d at 1379 (quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed.Cir.), reh'g and reh'g en banc denied (Fed.Cir. 2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir.1991))); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed.Cir.2006) (citations omitted); *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed.Cir.2006) (reviewing the con-

---

**4.** Included in the Joint Stipulated Facts submitted to the court were six additional proposed facts submitted by the plaintiff, which were not stipulated to by the defendant. At a status conference with both parties, however, the plaintiff agreed that the six facts it had proposed separately were not material and should not prevent a decision on the motion for partial summary judgment.

tract as a whole to determine the meaning of relevant provisions); *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted). The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998).

 " '[I]t has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation.' " *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct.Cl.1971)); *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed.Cir.1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); *see also Flexfab, LLC v. United States*, 424 F.3d 1254, 1262 (Fed.Cir.2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer....."). When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. *See Teg–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed.Cir.2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed.Cir.2003))); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed.Cir.2010), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied*, —— U.S. ——, 131 S.Ct. 997, 178 L.Ed.2d 826 (2011); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.

Cir.2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed.Cir. 1997) ("If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."); *Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). "Generally, the plain language of a contract controls; however, language that is reasonably susceptible to more than one interpretation, where 'each [interpretation] ... is found to be consistent with the contract language,' may be considered ambiguous." *Marquardt Co. v. United States*, 101 Fed.Cl. at 268 (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993)). Because an ambiguous or uncertain writing sometimes only can be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous contract clause. *See Cruz–Martinez v. Dep't of Homeland Sec.*, 410 F.3d 1366, 1371 (Fed.Cir.2005) (" '[M]eaning can almost never be plain except in a context.' " (quoting *Restatement (Second) of Contracts* § 212, cmt. b (1981))); *Barron Bancshares, Inc. v. United States*, 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003).

As indicated above, the Statement of Work in the RFQ stated: "The contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003. The audits will be conducted on payments made from *all fixed priced contracts*." (emphasis added). The subsequently issued Order did not incorporate the RFQ's Statement of Work. The separate Statement of Work attached to the Order awarded to Horn stated: "[t]he contractor shall perform a primary audit recovery on *all* contract payments for

the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." (emphasis added).

Plaintiff argues that it is entitled to partial summary judgment because the plain language of the Order required an audit recovery of *all* contract payments. Defendant argues that the language of the RFQ is controlling. Defendant contends that, as a matter of law, the "purchase order was limited to *fixed price contracts*," because the language of the RFQ was limited to audits " 'on payments made from *all fixed price contracts*,' " (emphasis added) and " '[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.' " (quoting *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed.Cir.2009) (emphasis omitted)). Defendant also argues that based on the doctrine of mistake and on the Competition in Contracting Act (CICA), the language of *all* contract payments included in the Order is not controlling.

The Statement of Work from the RFQ was not incorporated into the Order when it was issued. The defendant argues, however, that as the "solicitation [RFQ] was limited to fixed price contracts and NASA did not issue a new or amended solicitation purporting to change the scope or requirements of the July 23 solicitation, Horn has no basis to allege that it 'entered into a contract with NASA for the performance of recovery audit services ... *on all contract payments*.' " (emphasis in original). The defendant claims, "[a]ny changes to the scope of NASA's solicitation would have had to be recompeted pursuant to the CICA," which did not occur in the present case. Defendant states: "the purpose of our discussion of the Competition in Contracting Act ('CICA') was to illustrate that if NASA desired to alter the statement of work, the agency would have amended the solicitation and sent it out for re-competition. The fact that NASA did not re-solicit this procurement in accordance with CICA is evidence that NASA did not intend to alter the scope of work specified in the solicitation." The defendant concedes that the CICA does not require an agency to issue a new or amended solicitation for every contractual change, but states, " 'modifications outside the scope of the original competed contract fall under the statutory competition requirement.' " (quoting *AT & T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir. 1993)). Plaintiff responds that the "Contract [Order] is CICA compliant," and "to allow NASA to hide behind a claim that the Contract was not CICA compliant and therefore the language of the Solicitation is really the language of the Contract would be a great injustice."

■ The United States Court of Appeals for the Federal Circuit in *AT & T Communications, Inc. v. Wiltel, Inc.* wrote:

> The Competition in Contracting Act (CICA) requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A) (1988). CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement. CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement.

*Id.* at 1204–05 (footnote omitted).

The Memorandum for the Record for the Order for Supplies and Services, "Award of Contract Order No. NNH05CC28D to Horn and Associates, Inc.," signed by the Contracting Officer, specifically stated, "[t]he contract is CICA compliant." Additionally, NASA amended the Order, the operative contractual document in this case, to exercise an option to extend the Order, pursuant to the terms of the Order, which included the "all contracts" language for the option year. The Amendment of Solicitation/Modification of Contract which exercised the option, and, which also was signed by the Contracting Officer, stated that except for extending the

period of performance, "[a]ll other terms and conditions remain the same." At no time prior to the end of performance of the Order did the government suggest that the Order was not CICA compliant. With respect to CICA, the defendant, agrees, however, that "if the Court determines that the contract between the parties was for 'audit recovery on *all* contract payments,' rather than solely for *fixed-price contracts* . . . we are unaware of any authority, including the CICA, that would require the language of an executed, completed contract to be disregarded." (emphasis added).

Although defendant concedes that in the present case "neither party has conclusively established evidence demonstrating that both parties were mistaken in their belief regarding a fact," defendant, nevertheless, argues that since, "both parties intended the scope of work to only comprise fixed-price contracts . . . the doctrine of mutual mistake *could* be applicable here," and "it is plausible that the parties were mutually mistaken in their belief as to the scope of the contract." (emphasis added). The defendant claims that "NASA contracting personnel mistakenly appended an earlier, incorrect draft of the SOW to the contract, indicating the contract was to audit *all* contract payments." (emphasis added). According to the defendant, but without support in the record, "upon entering into the contract, both parties intended the scope of work to only comprise fixed-price contracts." In response, the plaintiff argues, "[a]t no time prior to the issuance of the Final Decision [by the Contracting Officer] did a person with contracting authority make a statement consistent with a mistake in award theory or any theory that would support this new position of NASA."

■ "In order to have a contract reformed, the party seeking reformation under the doctrine of mutual mistake must allege: '(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation.' " *Bank of Guam v. United States,* 578 F.3d

1318, 1329–30 (Fed.Cir.) (quoting *Atlas Corp. v. United States,* 895 F.2d 745, 750 (Fed.Cir. 1990)), *reh'g and reh'g en banc denied* (Fed. Cir. 2009), *cert. denied,* — U.S. ——, 130 S.Ct. 3468, 177 L.Ed.2d 1056 (2010). The Federal Circuit also has indicated that "[r]eformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof" of the four part test identified above. *Nat'l Austl. Bank v. United States,* 452 F.3d 1321, 1329 (Fed.Cir. 2006). Although reformation of contract terms is an available remedy for mutual mistakes, reformation of a contract term, such as the scope of a contract, is normally not available for a unilateral mistake. *See Cheyenne–Arapaho Tribes of Indians of Okla. v. United States,* 229 Ct.Cl. 434, 443–44, 671 F.2d 1305, 1311 (1982); *Brown v. Cnty. of Genesee,* 872 F.2d 169, 174–75 (6th Cir.1989); *Short Bros., PLC v. United States,* 65 Fed.Cl. 695, 797 (2005); *see also Land Grantors v. United States,* 81 Fed.Cl. 580, 602 (2008) (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 9.3, at 595 (3d ed. 2004) (" 'A mutual mistake occurs when both parties are under substantially the same erroneous perception as to the facts.' ")). The four elements must be proven by clear and convincing evidence. *See Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States,* 87 Fed.Cl. at 123.

■ The record fails to demonstrate a basic element of a mutual mistake, that "the parties to the contract were mistaken in their belief regarding a fact. . . ." *Short Bros., PLC v. United States,* 65 Fed.Cl. at 796 (quoting *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994)). Plaintiff, for one, has never agreed that the language included in the Order to audit *all* contracts was a mistake. Also contradicting the defendant's mutual mistake theory, and supporting plaintiff's theory on the scope of the contract, NASA provided Horn with payment data for *all* contracts, not just payment data of *fixed price contracts,* to conduct the recovery audit after the Order, with its "all contracts" language in the attached Statement of Work, was issued. It was not until well into contract performance, in a July 31,

2006 correspondence, that Horn was informed, for the first time, that its work pursuant to the Order should be restricted to fixed price contracts. In addition, correspondence contemporaneous to the Contract performance, and subsequent deposition testimony taken after the complaint in this case was filed, demonstrate that NASA personnel believed, both prior to the July 31, 2006 correspondence informing the contractor to restrict its audit to fixed price contracts, and thereafter, that the recovery audit was intended to cover *all* contracts. For example, even after the internal memorandum was sent within the agency indicating that Horn was to audit "payment records of *fixed price contracts*," (emphasis added), the Contracting Officer technical representative sent an email to all the NASA Centers informing the NASA Centers that the Contract was for the audit of "*all* contract payments." (emphasis added). Moreover, the Contracting Officer's technical representative, when asked at a deposition if there was a mistake in the award of the Order to perform the recovery audit on *all* contract payments, testified, "[n]o, I do not think that was a mistake." Likewise, on August 15, 2006, Terry Bowie, Deputy Chief Financial Officer of NASA, issued a memorandum to all NASA Centers stating: "A previous message regarding the program and contract with Horn and Associates, Inc[.] (Horn) indicated the company would be working with each Center to conduct an examination of payment records of only fixed price contracts. This limitation is not consistent with language in the NASA–Horn contract. Therefore, Centers please work with Horn to conduct an examination of *all* contracts." (emphasis added). When asked why he issued the memorandum, Terry Bowie testified at his deposition that it was "[t]o make it clear that Horn was able to look at basically *all* of the contracts." (emphasis added). At his deposition, when asked about any limitations on Horn's recovery audit, Bruce Ward of NASA, testified "I'm not aware of any limits to the contract, of what they could audit. In fact just the opposite, as I explained earlier, it was an understanding that they were auditing *all* of the payments." (emphasis added).

Even in the March 13, 2007 letter from the Contracting Officer to Horn, which represented the agency position with respect to disputed issues between Horn and NASA, the Contracting Officer stated, "[w]hile the contract document [Order] ... gave Horn the right to review *all* contracts, at this time it is inappropriate to determine if in fact overpayments have taken place on cost-type contracts that have not been completed." (emphasis in original). The Contracting Officer explained that, "[t]his is due to the fact that open contracts are still in the administrative phase of open payment cycles," but the Contracting Officer did not indicate the parties had been mistaken as to the "all contracts" scope of the contracts Horn was to review.

None of the above communications between Horn and NASA indicate that a mutual mistake had occurred. Any argument in favor of mutual mistake is further undermined by NASA's decision to exercise the first option and extend the Order without any change to the scope of work for the recovery audit, which was proceeding to audit *all* contracts. In fact, defendant's argument urging mutual mistake highlights that both parties understood the contract as awarded to plaintiff was to audit "all contracts."

■■■ In response to defendant's various arguments, plaintiff argues that if the court were to find ambiguity in the critical language, the court "should vigorously apply the rule of *contra proferentum* [sic] and construe any ambiguity against NASA." According to the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision .... the provision should be construed less favorably to that party which selected the contractual language." *United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224, *reh'g denied*, 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970); *see also Turner Constr. Co., Inc. v. United States*, 367 F.3d 1319, 1321 (Fed.Cir.2004) ("When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra proferentem*, which requires that

ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document."). This doctrine of *contra proferentem* " 'pushes the drafters toward improving contractual forms and it saves contractors from hidden traps not of their own making.' " *Fry Commc'ns, Inc. v. United States,* 22 Cl.Ct. 497, 503 (1991) (quoting *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970) (alteration in *Fry Commc'ns, Inc. v. United States)); see also Gardiner, Kamya & Assocs. v. Jackson,* 467 F.3d at 1352; *HPI/GSA–3C, LLC v. Perry,* 364 F.3d 1327, 1334 (Fed.Cir.2004).

Both parties agree, however, that there is no ambiguity in the words of either the Statement of Work attached to the RFQ or in the words of the Statement of Work attached to the Order. In fact, the stated terms in both the RFQ Statement of Work and in the Order Statement of Work are clear and not ambiguous. The Statements of Work when compared to each other, however, conflict. The Statement of Work for the RFQ stated: "[t]he contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003. The audits will be conducted on payments made from *all fixed priced* contracts." The subsequently issued language included in the Order Statement of Work, stated: "[t]he contractor shall perform a primary audit recovery on *all* contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." (emphasis added). Both Statements of Work clearly identify a range of contracts, albeit different ones, that Horn was to audit. The issue is which Statement of Work controls. Defendant argues a continuum theory, that the RFQ controls and that all subsequent documents issued in the agreement between the parties were subservient to the words of the RFQ and could not be modified in an inconsistent fashion. Plaintiff argues that the Order is the operative document because it came after the RFQ with a new, never modified, Statement of Work, and because the government proceeded to make all contracts available to the plaintiff.

Chronologically, the RFQ and its attached Statement of Work were electronically issued by the Contracting Officer to multiple offerors first. The Order and its attached Statement of Work were subsequently issued to Horn, and signed by the Contracting Officer, followed by the Amendment of Solicitation/Modification of Contract, the option, signed by the Contracting Officer and the contractor Horn. The Contracting Officer, therefore, was involved in, and fully aware of, the words contained in the chronologically issued Statements of Work and the exercised option. Moreover, NASA provided plaintiff with payment data for *all* contracts, not just payment data for fixed priced contracts, indicating that the government was proceeding on the understanding that "all contracts" were to be audited.

There are several bases upon which it was logical and reasonable for the contractor to rely on the words contained in the Statement of Work attached to the Order. The concept of *contra proferentem,* which directs that resolution of ambiguities (which have resulted in two reasonable possible interpretations) be resolved against the drafter of the document, although not strictly applicable to the instant situation, seems to offer some guidance by analogy here. The government sequentially drafted each and all of the documents at issue, the RFQ and its attached Statement of Work, the Order, which specifically indicated that it was subject to the terms and conditions of the blanket purchase agreement *"as amended by the clauses contained herein"* (emphasis added), and its attached Statement of Work, and the Amendment of Solicitation/Modification of Contract. The defendant, therefore, should be held accountable for the words included, or not included in each. The RFQ which recited the requirements and sought proposals from four possible contractors, resulted in issuance of a separate Order with its "all contracts" language in the Statement of Work to Horn. The Order to Horn did not incorporate the Statement of Work attached to the RFQ with its *"all fixed priced"* language, but attached its own Statement of Work, which included the *"all* contracts" language.

■ Additionally, the Order, which was issued after the RFQ, should control because, again by analogy, the doctrine of *lex posterior derogat legi priori* (more recent law prevails over earlier inconsistent law) directs that when two laws conflict, the later in time prevails. *See Harding v. Dep't of Veterans Affairs,* 448 F.3d 1373, 1376 n. 2 ("where two statutory provisions appear to conflict, the later in time prevails") *reh'g and reh'g en banc denied* (Fed.Cir. 2006); *see also* Norman J. Singer, Sutherland on Statutory Construction § 51.5 (7th ed. 2007) ("Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict the latter (more specialized) will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling. When two general or specific statutes are inconsistent, the more recent prevails.") (citations omitted); *Medellin v. Texas,* 552 U.S. 491, 518, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) ("later-in-time self-executing treaty supersedes a federal statute if there is a conflict") (citation omitted); *Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) ("We have held 'that an Act of Congress ... is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'") (citations omitted). Contract modifications and amendments should be interpreted in the same way, with the later, Contracting Officer, signed agreement between the parties controlling, especially when the earlier Statement of Work was not incorporated into the later documents, but was replaced by a new Statement of Work.

■ The requirement placed on plaintiff to audit *all* contracts in the Statement of Work attached to the later in time, separate Order, cannot be harmonized with the requirement to audit only *fixed price* contracts contained in the Statement of Work to the RFQ. Analogizing from the cannons of document construction discussed above, the later in time document prevails, the words in the Order supersede the words in the RFQ, and

the inconsistency between the two documents should be construed against the drafter, resulting in a conclusion that the "*all* contracts" language in the Order controls. From the outset, plaintiff was looking to reach an agreement to audit *all* contracts. In Horn's response to the RFQ before the Order was issued, plaintiff stated "[i]t is our opinion that you [NASA] need a 100% look at the Department's data to gain the full benefit of the recovery audit," and that Horn "would like to have access to *all* contracts, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc." (emphasis added). Horn, therefore, was prepared to go forward with the terms of the Order as written and presented by the government to Horn. Moreover, as noted above, the government provided Horn with payment data for *all* contracts, not just payment data for fixed price contracts.

Finally, plaintiff argues that, regardless of defendant's reliance on the discrepancy between the RFQ and the Order, NASA ratified the terms of the Order, giving Horn the responsibility to review *all* contracts, and not just *fixed price contracts.* Plaintiff argues that, "[f]urthermore, if this court should find the contract as awarded was in fact a mistake—an unauthorized act—the Contract was ratified by Janet Langweil, the CO [Contracting Officer], upon issuance and signing of Modification 1 to the Contract...." Notably, plaintiff was given access to *all* contracts for audit purposes. Plaintiff also asserts: "Dean Patterson who became the CO after Janet Langweil left NASA, issued the final agency position during contract close out stating: 'the contract document ... gave Horn the right to review *all* contracts ....'" (omission in original and emphasis added). Defendant responds, "[b]ecause the CICA requires agencies to evaluate competitive proposals based solely upon the factors specified in the solicitation, NASA could not have 'ratified,' the purchase order to apply to anything but what was set forth in the solicitation." Defendant also argues that NASA "could ratify the scope of work to include all contracts only if the original agreement was invalid or unauthorized."

■ The concept of ratification requires that a superior official "have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." *California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27–28 (1990), *aff'd*, 937 F.2d 624 (Fed.Cir.1991) (table), *cert. denied*, 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992); *see also Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir.2002) (quoting Restatement (Second) of Agency § 82 (1958)) ("Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.' ") *cert. denied*, 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003); *Americopters, LLC v. United States*, 95 Fed.Cl. 224, 233 (2010); *Leonardo v. United States*, 63 Fed.Cl. 552, 560 (2005) ("Effective ratification requires a detailed level of factual knowledge: The ratifying official must have known, at the time of ratification, the material facts and circumstances pertinent to the agreement at issue."), *aff'd*, 163 Fed.Appx. 880 (Fed.Cir. 2006).

■ Full knowledge of the facts is required. For example, agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts. *See United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901); *see also Flexfab, L.L.C. v. United States*, 424 F.3d at 1260 (" 'A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States.' " (quoting *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997))); *Adamowicz v. United States*, 101 Fed.Cl. 485, 490 (2011) ("Only a government employee with actual authority can make an otherwise unauthorized agreement binding by ratifying it.") (citation omitted); *BioFunction, L.L.C. v. United States*, 92 Fed.Cl. 167, 172 (2010); *California Human Dev. Corp. v. United States*, 87 Fed.Cl. 282, 293 (2009),

*aff'd*, 379 Fed.Appx. 979 (Fed.Cir.2010); *Aboo v. United States*, 86 Fed.Cl. 618, 629, *aff'd*, 347 Fed.Appx. 581 (Fed.Cir.2009); *SGS–92–X003 v. United States*, 74 Fed.Cl. 637, 653–54 (2007).

Quoting from the United States Supreme Court, the Federal Circuit wrote:

> "Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the government as in that of an individual. Knowledge is necessary in any event.... If there be want of it, though such want arises from the neglect of the principal, no ratification can be based on any act of his. Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them."

*Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.) (quoting *United States v. Beebe*, 180 U.S. at 354, 21 S.Ct. 371) *reh'g denied, en banc suggestion declined* (Fed.Cir. 1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *see also Winter v. Cath–dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed.Cir.) ("Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority."), *reh'g and reh'g en banc denied* (Fed. Cir. 2007); *Schism v. United States*, 316 F.3d at 1294 (" 'At the time of ratification, the purported principal must have knowledge of all material facts concerning the transaction.' " (quoting Harold G. Geuschlein & William A. Gregory, The Law of Agency and Partnership, § 30, at 74 (West 2d ed. 1990))); *Henke v. United States*, 43 Fed.Cl. 15, 27 (1999) ("Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing."); *Khairallah v. United States*, 43 Fed.Cl. 57, 64 (1999); *see also* 48 C.F.R. § 1.602–3 (2012), "Ratification of unauthorized commitments (Nov. 2007)." 48 C.F.R. § 1.602–3(a) states in part, "[r]ati-

fication, as used in this subsection, means the act of approving an unauthorized commitment by an official who has the authority to do so." Additionally, 48 C.F.R. § 1.602–3(c) states that the authority to ratify can only be exercised when "[t]he ratifying official has the authority to enter into a contractual commitment," 48 C.F.R. § 1.602–3(c)(2), and "[t]he resulting contract would otherwise have been proper if made by an appropriate contracting officer." 48 C.F.R. § 1.602–3(c)(3); *see also Stout Road Assocs., Inc. v. United States,* 80 Fed.Cl. 754, 758 (2008) ("authorizing ratification only if '[t]he resulting contract would otherwise have been proper if made by an appropriate contracting officer.'" (quoting 48 C.F.R. § 1.602–3(c)(3))); *Gary v. United States,* 67 Fed.Cl. 202, 215 (2005).

█ In this case, the Contracting Officer, with authority to do so, issued and signed the Order, with its attached Statement of Work to audit *all* contracts, and also signed the Amendment of Solicitation/Modification of Contract option to extend the agreement between the parties. The Contracting Officer personally put the Order number on the upper right hand corner of each page of the Order, including the Statement of Work identifying the scope of work as encompassing *all* contracts, signifying the Contracting Officer's review and approval of the language of the Order and the Statement of Work attached thereto. The Contracting Officer also would have, or is presumed to have known, that NASA had provided Horn with payment data for *all* contracts for Horn's recovery audit, not merely payment data on *fixed price contracts.* By her action, even if defendant's other arguments were valid, the Contracting Officer ratified the *all* contracts language in the Order and in the option. As the plaintiff argues, "NASA demonstrated its acceptance of the Contract by expressly and repeatedly recognizing the existence of the contract ... for a primary audit recovery of *all* contract payments." (emphasis added).

## CONCLUSION

The Statement of Work attached to the Order signed by Horn and the Contracting Officer determined the scope of the agree-

ment between the parties and required the plaintiff to perform a primary audit recovery on *all* contract payments for the time period specified. As discussed above, the arguments to the contrary by the defendant are not persuasive. Plaintiff's motion for partial summary judgment is **GRANTED.**

**IT IS SO ORDERED.**